Congress and Empire Spring Co. *v.* High Rock Congress Spring Co.

———————•●•———————

## THE CONGRESS AND EMPIRE SPRING COMPANY *vs.* THE HIGH ROCK CONGRESS SPRING COMPANY.

The principle which underlies the doctrine of trade-marks is, that he who, by his skill, industry or enterprise, has produced or brought into market or service some commodity or article of use, convenience, utility or accommodation, and affixed to it a name, mark, device or symbol which serves to designate it as his, is entitled to be protected in that designation from encroachment, so that he may have the benefit of his skill, industry or enterprise, and the public be protected from the fraud of imitators.

The doctrine of trade-marks can have no application to a name given to a natural element in its natural state.

All the cases reported are cases where the marks infringed were used and applied to artificial compounds, products or manufactures originated by the science, skill, diligence or enterprise of man; and in all these cases the principle of the law is stated and restated as applicable to protect the skill, industry and enterprise of mechanics, manufacturers and inventors; and hence only applicable to artificial products. *Per* JAMES, J.

Where the plaintiff, as owner of a mineral spring, called the "Congress Spring," and widely known as such, and its water by the designation of "Congress Spring water," for over seventy years, was entitled to the rights of its predecessors in the use of the word "Congress," and that word had previously only been used and applied to water in connection with said spring and its water; it was yet *Held* that as the water was not an artificial product, and there was nothing in the mode of bottling the water for sale, or the mode of sale, originating with the plaintiff, or the former owners, which the word "Congress" defined, designated or implied, the plaintiff had no exclusive right

to the use of that word in connection with such business, or in connection with the word "water," or the words "spring water."

Accordingly *held* that the plaintiff was not entitled to an injunction against a corporation called the "High Rock Congress Spring Company," the owner of another mineral spring, named the "High Congress Spring," to restrain such corporation from using the name "High Rock Congress Spring Company," or any name containing "Congress Spring Company," in its business of putting up mineral waters; and from using or putting upon any bottles, corks, boxes or packages, &c., the words "Congress water," or "Congress Spring water," either alone or in connection with other words, &c.

A name can only be protected as a trade-mark when it is used merely as indicating the true origin or ownership of the article offered for sale. Never when it is used to distinguish the article itself, and has become, by adoption and use, its proper appellation.

*Held* that within the above principle neither the plaintiff, or its predecessors, acquired, or could acquire, any property in, or exclusive right to the use of, the word "Congress," in connection with the word "water," or the words "spring water;" because that word had no relation to, and did not indicate the origin or ownership of the article named, but only designated the article itself, which designation had become, by adoption and use, its proper appellation.

APPEAL by the plaintiff from an order of the special term dissolving an *ex parte* injunction restraining the defendant from using the trade-mark of the plaintiff, and from selling as "Congress water," other water than the natural water of the Congress Spring at Saratoga Springs.

The motion was based upon complaint, answer and affidavits. The complaint averred the plaintiff to be the owner of a spring discovered in 1792, and then named Congress Spring; that its waters were widely known as "Congress water," and as possessing peculiar medicinal virtues; that there were many other mineral springs at the same place, but none possessing the same peculiar properties, and none had ever been called by the name of "Congress Spring," or their waters "Congress water." That from 1825 the proprietors of said spring had been engaged in bottling its water and selling it as "Congress water," which business has become very extensive, and "Congress water" has become a well known article of

commerce; and that during all the period since 1825 the proprietors of said spring, until the acts of the defendants, herein complained of, had enjoyed the exclusive use of the name of "Congress water." The manner in which suc-cessive proprietors of said spring had put up its waters, the bottling, corking, marking, and labeling is then set forth, and it is averred that it had been customary for each proprietor to re-purchase bottles emptied, and in that way use bottles with the proprietary marks of his predecessors. It was then alleged that the defendant had recently commenced selling medicinal water, intended to resemble "Congress water," under the name of "*High Rock Congress Water;*" that it used bottles of the same general form, with marks upon the cases and boxes resembling those used by the plaintiff, and that it did this to deceive the public, and to induce the belief that the water it sold was the water of "Congress Spring," and to sell it as "Congress water."

Judgment was demanded that the defendant &c. be restrained from using the name "High Rock Congress Spring Company," or any name containing "Congress Spring Company," in the business of putting up mineral waters, and from using or putting upon any bottles, corks, boxes, or packages, &c., the words "Congress water," or "Congress Spring water," either alone or in connection with other words, &c.

Upon the complaint, and upon affidavits annexed, showing that the defendant was putting up water in bottles in the general form used by the plaintiff, marked "High Rock Congress Spring Water Company, C. & W., Saratoga, N. Y.," and kept a place in New York for the sale thereof, with a sign, "High Rock Congress Spring Company," a temporary injunction was granted restraining the defendant, &c., as prayed for in the complaint.

The answer of the defendant denied all the allegations of the complaint, except as thereinafter admitted; and

particularly denied all fraud or intent to defraud, &c. It conceded that John Clarke owned the Congress Spring from 1825 to 1846, when he died; it then averred that the business of bottling and selling the water of Congress Spring was carried on by Eliza Clarke, the widow, under the name of "Heirs of John Clarke," until September, 1846, when W. B. White and D. Shepherd became jointly interested and carried it on under the style of " Clarke & Co.," using the trade-marks, words and other symbols used by John Clarke, under the authority of Mrs. Eliza Clarke, his widow, to whom such right had been conveyed, and paying her therefor one thousand dollars per year until July 1865; that in July 1865 said "Congress Spring" was, by the executors of John Clarke, conveyed to Eliza Sheehan, and by her subsequently conveyed to the plaintiff, and that said executors did not assume to convey any right, and the conveyances conferred no right upon the plaintiff, in or to the use of any trade-mark, words, symbol or other designations which had theretofore been used by the former proprietors of said Spring, or either of them. That the High Rock Spring, now owned by the defendant, was owned by John Clarke in his lifetime, and that afterwards its title was in parties controlling Congress Spring, until the conveyance by them to Mrs. Sheehan; that during all that period the proprietors of said Spring had bottled and sold the waters of said High Rock Spring in similar bottles, with marks similar to Congress Spring water, except that it was called "High Rock Spring water;" that said waters are very similar in their qualities; that the word " Congress," as applied to mineral water, is used to denote the quality of the water, and not its *origin or ownership*, and is an arbitrary name; that the word "Congress " has been applied to "Putnam's New Congress Spring," and that the name used by the defendant, "High Rock Congress Spring," is not calculated to deceive the public, or any one who deals in the waters of either spring.

That the bottles used by the defendant have a raised representation of the rock at their spring. That Mrs. Clarke, in whom remained the right to use said trade-marks, &c., transferred the right to use them to the defendant, and the defendant has the right to use the same. This answer was duly verified.

The affidavits established that the plaintiff's spring was discovered in 1792; that it was named " Congress Spring" because discovered by a then member of Congress; that it had ever since that time retained that appellation; that with the exception of a spring known as "Putnam's Spring," having been called "Putnam's New Congress Spring" for a short time, the plaintiff's was the only spring known as " Congress Spring;" that its waters had become quite an article of commerce, and had obtained a wide reputation for medicinal virtues; that it was put up in pint and quart bottles, each having impressed upon it, in raised letters, " Congress and Empire Spring Co., Saratoga, New York;" that the bottles were put up in boxes and marked with the same words, except that the letter "C" was inside of the outlines of a bottle. That High Rock Spring was discovered many years before Congress Spring, and was always known by the name of High Rock Spring; that said spring is now owned by the defendant; that its waters are now bottled in pint and quart bottles in shape similar to those used by the proprietors of Congress Spring; and have impressed and raised upon them, " *High Rock Congress Spring Water,*" a conical rock, " *C. & W., Saratoga, N. Y.*" That this water is put upon the market; that a wholesale warehouse for the sale of the same is kept in New York; that the bottles are put up in boxes and marked in its name, but in similar form to the plaintiff's boxes, and that the word " Congress" is used in the defendant's name and on its bottles, as likely to bring more custom and insure more sales than could be obtained without it.

The allegations in the defendant's answer are, that the

Congress and Empire Spring Co. *v.* High Rock Congress Spring Co.

plaintiff had no right to the trade-marks, words, symbols, or other designations which had been used by the former proprietors of Congress Spring; but that the same were the property of Mrs. Eliza Clarke, is not denied.

A motion having been made, by the defendant, to dissolve the temporary injunction, the following opinion was delivered at the special term:

ROSEKRANS, J. It is well settled that a court of equity will not exercise its power to restrain the use of a trade mark, the exclusive right to which is claimed by the plaintiff, unless a good legal title thereto is alleged in the complaint, and the court can see from the plaintiff's own statements that the right which he seeks to have protected clearly belongs to him, and has been infringed. (25 *Am. Jurist,* 279.) Nor will the court interfere by injunction when such title is alleged, if the right is denied by the defendant, or is rendered doubtful. (2 *Sandf.* 599.) *Wolfe* v. *Goulard,* (18 *How. Pr.* 64,) opinion of INGRAHAM, J., citing 2 *Barb.,* and *Motley* v. *Dennison,* (3 *Mylne & Craig,* 14,) is within these principles. I think that the injunction order in this case should be vacated, so far as it restrains the use by the defendant of any trade-mark used by the former proprietors of Congress Spring upon the bottles or corks used in bottling the waters of that spring, or the boxes in which they packed their bottles.

The plaintiff does not aver that it purchased the right to use such trade-marks, or that the right was assigned to it, and such right is only deducible from the allegation that the plaintiff purchased the Congress Spring. The conclusion by no means follows that the right to the trade-mark passed with the title to the real estate. Indeed, it is questionable whether the plaintiff could be protected in the use of the trade-mark of a former proprietor of the spring under an express assignment of the right, unless

he indicated that he used them as assignee of the former proprietor.

The use of such trade-mark without such indication, would be an imposition upon the public—"a sailing under false colors," to use the language of Wilson, Ch. J., in *Sherwood* v. *Andrews*, (*Am. Law Reg. Aug. 1866, p. 597.*) In *Partridge* v. *Menck*, (cited 13 *How. R.* 397; *How. App. Cases*, 547,) Gardner, J., delivering the opinion of the Court of Appeals, says: "An assignee of a trade-mark has no special privilege of deceiving the public, even for his own benefit." It is, however, unnecessary to consider the question how an assigned trade-mark should be used. It is sufficient for the purpose of determining whether the injunction order should be retained, so far as it restrained the defendant in the use of the trade-mark of the former proprietors of Congress Spring, that the plaintiff has not alleged or set out such rights in himself, except inferentially; and the inference he seeks to have adduced from his allegations does not legally follow. In addition to this, the defendant's answer expressly alleges that such rights were not assigned to the plaintiff, and that the parties who conveyed Congress Spring to the plaintiff neither conveyed or assumed to convey to the plaintiff any right, title, or interest in or to the use of any trade-marks, words, symbols, or other designation which had theretofore been used by the former proprietors of said spring; and the plaintiff, in the affidavits read in opposition to the motion to dissolve the injunction, fails to furnish any evidence to contradict these allegations of the answer. These remarks are intended to apply to all the trade-marks used by the former proprietors of Congress Spring, both their form and substance, except the words " Congress Spring," and " Congress water." As owner of the spring, the plaintiff has the right to use those words as descriptive of property in any manner it may choose, and the question whether such right is exclusive is the principal one to be consid-

ered,　The word "Congress," as applied to this spring, was an arbitrary name, given to it at the time of its discovery in 1792, for the reason that the person who discovered it was at the time a member of Congress; and the water of this spring is called Congress water because the spring is called Congress Spring.　These names are merely descriptive of the spring and its waters.　They have been used for that purpose for three-fourths of a century, and by such use have become the proper appellation of the spring and its water.　They have no reference to the title or ownership of either the spring or its water, but are used merely to designate them.　It may be, and doubtless is the fact, that to most persons who use the water, the name thus adopted is suggestive of its properties and qualities; that it is a mineral water having certain medicinal qualities, and producing certain effects upon the human system. But to none can it convey any idea as to who is the owner of the spring, or who is engaged in bottling and vending its waters.　The law in relation to the use of names or words as trade-marks, and the extent to which an exclusive right can be maintained to such use, under the protection of a court of equity, has been fully considered by the courts of this State, and is well established.

In *Wolfe* v. *Goulard,* (18 *How. Pr.* 64,) most of the cases are considered by Ingraham, J., and their substance is expressed by him as follows : " Where a person forms a new word, used to designate an article made by him, which has never been used before, he may obtain such a right to that name as to establish him in the sole use of it as against others who attempt to use it for the sale of a similar article ; but such an exclusive use can never be successfully claimed of words in common use, previously, as applicable to similar articles.　*　*　*  Words, as used in any language, cannot be appropriated by any one to his exclusive use to designate an article sold by him similar to that for which they were previously used."

In *Burgess* v. *Burgess*, (17 *Eng. Law and Eq. R.* 257,) it was held that a person had a right to make and sell an article called "Essence of Anchovy," although the plaintiff and his father had, for a long term of years, been making and selling such an article, under that name, originally invented by them, and that, too, when the same was sold in bottles of the same shape as the plaintiff used, with labels, wrappers and catalogues bearing a general resemblance to those used by him.

In *The Amoskeag Manufacturing Co.* v. *Spear & Ripley*, (2 *Sandf.* 599,) Duer, J., says : "It is certain that the use by another manufacturer, of the words and signs indicative only of these circumstances," in indicating the origin of the article, its appropriate name, the mode or process of its manufacture, "may yet have the effect of misleading the public as to the true origin of the goods; but it would be unreasonable to suppose that he is, therefore, precluded from using them as an expression of the facts which they really signify, and which may be just as true in relation to his goods as those of another."

In *Stokes* v. *Landgraff*, (17 *Barb.* 608,) the point was fully discussed by Strong, J. After showing the cases in which one may by priority of appropriation obtain a right to the use of names, letters, marks or symbols of any kind, he adds: "In respect to words, marks, or devices which do not denote the goods or property, or particular place of business of a person, but only the nature, kind or quality of the articles in which he deals, a different rule prevails. No property in such words, marks or devices can be acquired."

Mr. Justice Duer, in *Fetridge* v. *Wells*, (13 *How. Pr.* 355,) says, a name may rightfully be used as a trade-mark, but this is only true when the name is used merely as indicating the true origin and ownership of the article offered for sale—never when it is used to designate the article itself, and has become, by adoption and use, its

proper appellation. The name, no matter when or by whom imposed, becomes, by use, its proper appellation. Hence, all who have an equal right to manufacture and sell the article, have an equal right to designate and sell it by its appropriate name, *provided each person is careful to sell the article as prepared and manufactured by himself, and not by another*. The exclusive right to use as a trade-mark the appropriate name of a manufactured article exists only in those who have an exclusive right to the article itself. So it was held by Lord Mansfield, in *Singleton* v. *Bolton*, (3 *Doug*. 293,) that although the plaintiff had been selling a particular medicine under the name of Dr. Johnson's Yellow Ointment, yet the defendant had an equal right to prepare and sell it under the same name, there being no evidence to show that he sold it as prepared by the plaintiff. In *Perry* v. *Moffit*, (6 *Beavan*, 66,) the plaintiff claimed to be the inventor of "Perry's Medicated Mexican Balm," and applied for an injunction to restrain the defendant from selling a similar medicine, which he called Moffit's Medicated Mexican Balm, but the injunction was not granted.

In *Clark* v. *Clark*, (25 *Barb*. 76,) Justice Mitchell held, in the general term of the first district, that a manufacturer might use the same word as another to designate his manufacture, but must not use it to imitate an article previously sold by another.

In *Brooklyn White Lead Company* v. *Masury*, (25 *Barb*. 416,) the court held that although the plaintiff had sold their lead under the name of Brooklyn White Lead for a long time, yet that the defendant might assume the same name to describe a similar article sold by him, and only restrained him from adding the word "Co." thereunto as used by the plaintiff. And in the *Merrimack Manufacturing Co*. v. *Garner*, (4 *E. D. Smith*, 387,) it was said that the defendant had a right to imitate and sell the same style of goods as those manufactured by the plaintiffs, and

that the plaintiffs had no ground of complaint, unless the label used upon the articles in imitation, could lead persons to suppose they were buying goods actually manufactured by the plaintiffs. "From these cases, and various others which might be cited," says INGRAHAM, J., "it is apparent that no persons can acquire a right to the exclusive use of words applied as the name of an article sold by them, if, in the ordinary acceptation, they designated the same or a similar article. Applying these principles to the case under consideration, it is clear that the injunction order must be vacated. The plaintiffs and their predecessors have applied to a natural object, a mineral spring owned by them, an arbitrary name by which it has been known for upwards of seventy years. Such name has become its proper appellation. The water of the spring, for the same length of time, has been known as Congress water. Such use has made the name its proper appellation. The plaintiff and its predecessors have no exclusive right to all mineral waters having the same or similar properties, and therefore have no exclusive right to the name which they have thus applied. The defendants, as they allege in their answer, and as is not denied, are the owners of another spring, the water of which is very similar in its peculiar mineral qualities to that of Congress Spring, the water of the defendant's spring being in every respect equal, if not superior to the water of Congress Spring. The analysis of the water of these two springs presented to me on the argument, and contained in Steel's and Allen's analysis of the water of various springs at Saratoga, shows that the same elements enter into the composition of the waters of the plaintiff's and defendant's springs, although not in precisely the same proportions in both.

The defendants have applied to the water of their spring a name which for years has designated such similar water of the plaintiff, and in order to protect the public against

·deception, and to prevent purchasers being induced to believe that the water sold by the defendant is obtained from Congress Spring, they have prefixed to such name and united with it that of another spring, discovered earlier than Congress Spring, and known for a .longer time as *High Rock Spring*, and designating the water which they sell as High Rock Congress Spring Water. The representation made by this name I regard as true, and in no way calculated to deceive the public or to injure the plaintiff. In order to maintain this action for damages, or for preventive relief by injunction, it is necessary that it should appear that the name adopted by the defendant is calculated to mislead the public into the belief that the defendant is selling the waters of Congress Spring, and that it is or has been engaged in selling the water of its own spring as that of the plaintiff's. The defendant denies that it has ever sold the water of its spring as water from the plaintiff's spring, *and no evidence is produced on the part of the plaintiff to show that the defendant has made such sales.* The injunction order should be vacated.

*Wm. Tracy*, for the appellant.
As to the *facts*, we claim that it was alleged and shown, *First*. That the Congress Spring at Saratoga had been known for many years, and its water had acquired a reputation as possessing medicinal virtues peculiar to itself, and not possessed by any other water; that it belongs to the plaintiff; and that its water, bottled, had, by the plaintiff and its predecessors in the ownership of this spring, become a well known article of commerce, throughout not only the United States, but the British provinces, the West Indies, South America and Europe. *Second*. That the word "Congress" is not, as alleged in the answer, "as applied to mineral water, used to denote the quality of the water, and not the origin or ownership, and is an arbitrary name which has by use come to be applied to mineral water in-

dicating certain mineral properties or qualities." But that in fact it had for about seventy-five years been applied to distinguish the plaintiff's spring from all others; and that the term as applied to water, was simply descriptive of the fact that it was water naturally flowing from the Congress Spring, and not of its qualities, constituents or properties, and was not applicable to any other water. *Third.* That spring, by its name, with the proprietary trade-marks which had for many years been used by its proprietors in putting up and selling its water, had, before the existence of the defendant, become the property of the plaintiff, in so far as to prevent any other person from using those marks to interfere with the sale of Congress water. *Fourth.* That the defendant's trustees, for the express purpose of introducing the sale of other water as Congress, and because they thought that by introducing the name " Congress" after the words " High Rock," people would purchase it, not knowing that it was not Congress water, adopted this name; and to further impose upon the purchasers, purchased, as appears from their answer, from the widow of a former proprietor, after all her interest in the Congress Spring had ceased, the pretended right to use the trade-marks of the former proprietors; and that they now insist upon their right to use the same.

Under this state of facts, we submit that, as matter of law, the protection of its injunction should not have been overruled.

As to the *law*, we submit,

I. That the right of a party to a trade-mark, adopted to distinguish the article produced or prepared by him, in his trade or business, has been, both by the courts in England and this country, long recognized. It may be the use of his own name with any peculiar style of type or ornament; the name adopted for his place of business; any unappropriated fancy name to indicate ownership or origin, which does not, in its ordinary signification, des-

Congress and Empire Spring Co. *v.* High Rock Congress Spring Co.

ignate the same or a similar article, or simply indicate its quality, kind, texture, composition, destined use, or class of consumers. (*Wolfe* v. *Goulard*, 18 *How. Pr.* 64. *The Amoskeag Manuf. Co.* v. *Spear*, 2 *Sandf.* 599.) The doctrine of this case is, that every manufacturer and every merchant for whom goods are manufactured, has a right to distinguish the goods he sells by a peculiar mark or device, so that they may be known as his in the market, and that the public interest as well as his own, requires that he be protected in it; that one who affixes an imitation of this trade-mark to another article, commits a fraud upon the public and the owner of the mark, and equity will restrain him on the ground of preventing fraud. The imitation may be complete or partial; in either case, if it would probably deceive the public, it will be restrained. "In an imitation of the original mark upon an article or goods of the same description, the name of the proprietor may be omitted—another name, that of the imitator himself, may be substituted; but if the peculiar device is so copied as to manifest a design of misleading the public, the omission or variation ought to be wholly disregarded. Its object, we may be certain, was not to communicate truth, but to escape the penalty of falsehood. A fraud is intended, an unlawful gain is meant to be realized, but it is believed or hoped that an injunction may be avoided, and a claim for profits or damages repelled." (*Id. p.* 608. *See also, Id.* 619, 613, *for the application of the doctrine; Coats* v. *Holbrook*, 2 *Sandf. Ch. Rep.* 586, *and the notes, and cases there cited.*) The case holds, fully, the doctrine that one who assumes a particular name or mark to indicate the article he manufactures or deals in, is to be protected from the attempts of others to obtain his trade by simulating his marks. It is not enough that an examination of the marks may show a difference. The doctrine is, that when the imitation is calculated to deceive, it will be restrained.

In our case it is shown affirmatively, and is not denied, that the simulation was intended to deceive and defraud the public, and to impose upon them as Congress water some other water. The various cased cited in the notes to the last mentioned case establish the principle. *Lewis* v. *Langdon*, (7 *Simons*, 421,) was as to the right by a survivor of a partnership to use its firm name as a trade-mark. It was held he might, and might restrain the executor of the deceased from using it. In *Pidding* v. *Howe*, (8 *Simons*, 477,) although an injunction was denied, yet the vice chancellor said the defendant "was not at liberty to make and sell a mixture of his own, under the same designation the plaintiff had appropriated," which was Howqua's Mixture. In *Croft* v. *Day*, (7 *Beavan*, 84,) the executors of the surviving partner continued the business under the firm name of "Day & Martin, 97 High Holborn." The defendant Day was a nephew, and associated with one Martin, under the firm of Day & Martin, labeling their bottles with an imitation of the old firm label, but substituting the royal arms for those of the firm, and inserting " 90½ Holborn Hill," in place of 97 High Holborn. Lord Langdale ordered an injunction, saying the defendants' contrivances were calculated · to mislead the bulk of the unwary public with the impression that the new concern was connected with the old manufactory. *Hine* v. *Lart* (10 *Lond. Jurist Rep.* 106) was the case of the trade-mark "Ethiopian," on black cotton stockings. The answer denied that the plaintiffs were entitled to it, alleging its use by other parties before the plaintiffs. The vice chancellor said it was evident, from the defendant imitating the plaintiffs' mark, they knew they might gain an advantage by it to which they were not entitled, and he refused to dissolve the injunction. *Blofield* v. *Payne*, (4 *Barn. & Adol.* 410,) is a case to show that it is no answer that the simulated article is as good as the genuine. *Crowshay* v. *Thompson* (4 *Man. & Gran.* 357) was an action at law, for

Congress and Empire Spring Co. *v.* High Rock Congress Spring Co.

using the plaintiffs' trade-mark on iron. It was left to the jury to determine, first, whether the defendant's mark bore so close a resemblance that it was calculated to deceive *the unwary;* and, secondly, whether the defendant used the mark with the intention of supplanting the plaintiff.

Where one intentionally uses or closely imitates another's trade-marks, the law presumes it done fraudulently, to induce the public, or those dealing in the article, to believe the goods are those made or sold by the latter; and it is wholly immaterial that the simulated article is of equal or superior value. (*Taylor* v. *Carpenter*, 2 *Sandf. Ch.* 603.)

In *Clark* v. *Clark*, (25 *Barb*. 76,) the plaintiffs, J. Clark Jr. & Co., manufacturers of spool cotton, adopted, as a mark to be placed on it, concentric circles in gold and silver. In the inner circle the number of the cotton; in the second, " J. Clark Jr. & Co., Mile End, Glasgow;" in the next, " six-cord cabled thread, 200 yards;" in the outer circle, " sole agent, Wm. Wheelwright, New York." The defendants, J. & J. Clark & Co., adopted a similar device, but the inscriptions were, instead of " J. Clark Jr. & Co., Mile End, Glasgow," " Clark & Co., Seed Hill, Paisley," and in the outer circle, "sole agent, George Clark, New York." It was obvious to any one who would carefully compare the inscriptions, that they were different, and yet an ordinary reader would not discover the difference. The court say, (p. 79,) "An imitation of his mark, with partial differences, such as the public would not observe, does him the same harm as an entire counterfeit." The court held that J. & J. Clark & Co. had a right to sell thread under their own name, with the name of their agent, but that they must do this " so as not to appear to imitate the plaintiffs'." In *Bloss* v. *Bloomer*, (23 *Barb*. 604,) the court held that a contract by the plaintiff to furnish paper bags, with the plaintiff's trade-mark, to an-

other, to put up seeds not raised by the plaintiff for sale, contrary to the spirit of the law, was a fraud on the public, and void. Judge E. Darwin Smith remarks, (p. 609,) "This court protects the title of the author or inventor of any names, marks, letters or other symbols, which any manufacturer, trader, or other person has devised and appropriated, or been accustomed to use in his trade or business, and restrains by injunction any unauthorized use thereof." In *Howard* v. *Henriques*, (3 *Sandf*. 725,) the plaintiff opened a hotel in New York, and called it "*The Irving House*." He had no sign, but the name was used on his bills and his cards. Soon, people indiscriminately called it the Irving *House*, and the Irving *Hotel*. The defendant then opened a hotel, calling it The Irving *Hotel*. The defendant was enjoined from the use of the name, by a justice of the superior court, and on appeal the injunction was affirmed, by all the judges. The court say: "We think that the principle of the rule is the same, *to whatever subject it may be applied*, and that a party will be protected in the use of a name which he has appropriated, and by his skill rendered valuable, whether the same is upon articles of personal property which he may manufacture, or applied to a hotel where he has built up a prosperous business." "One must not dress himself in another man's garments, and by assuming another man's name, endeavor to deprive that man of his individuality, and thus deprive him of the gains to which, by his industry and skill, he is fairly entitled."

In *Williams* v. *Johnson*, (2 *Bosw*. 1,) the plaintiffs, under the firm of "Williams & Brothers," manufactured a soap, to which they gave the name of "*Genuine Yankee Soap*." They put it up in a particular manner, with a label having an inscription, "*Genuine Yankee Soap, manufactured at Manchester, Conn., by Williams & Brothers, Chemists and Apothecaries*." The defendants afterwards commenced the manufacture of soap put up in similar form, but with

a label bearing the inscription, "*Genuine Yankee Soap, manufactured at New York, by L. Williams & Co.*" The arrangement of the letters and form of packages was similar. An injunction was granted, restraining the defendant. On appeal, Judge Woodruff examines the rule, and shows the palpable attempt by the defendant to defraud the plaintiff. He says, (p. 6,) " It is true that the defendant has put upon his labels New York as the place of manufacture, and L. Williams & Co. instead of Williams & Brothers, as the manufacturers ;" but (p. 8) it is so palpable as to admit of no reasonable doubt, that the devices employed by the defendant were calculated and intended by him to secure the benefit of the reputation which the plaintiff had acquired. He is, in this respect, entitled to no favor. The court, in considering the propriety of enjoining him, pending the litigation, will not feel called upon to be zealous to aid him by refined distinctions, so that he may evade the letter and violate the scope and spirit of the adjudged cases."

In *Corwin* v. *Daly*, (7 *Bosw.* 222,) Campbell procured gin from Holland, which he put up in bottles and cases, with a label, " Club-House Gin," in gilt letters. He transferred the right to use it to the plaintiff. The defendant bottled imported gin in square bottles, with " Club-House, J. T. Daly," blown on them, and a white paper label printed in black, "London Club-House Gin, sole importer Wm. H. Daly." After the defendant had the flasks with the letters blown on them the plaintiff had the letters " Club-House Gin, W. S. C.," blown on theirs. No fraudulent intent was charged in the complaint, proved by the evidence, or found by the court. The whole of the labels, and of the letters on the bottles, and of the boxes in which they were packed, were dissimilar. It was shown that the word Club-House had for a long time been used simply to denote a superior quality of gin, fit for use in club-houses. The court held that a dealer cannot be protected

by adopting a name for an article which does not express its *origin, ownership* or place of manufacture or sale, but merely its quality, kind, texture or composition, destined use or class of consumers. It recognized the exclusive right, when the name is used to indicate the true origin of the article.

In *Burnett* v. *Phalon*, (9 *Bosw.* 192,) it appeared that in 1857 Burnett manufactured a hair oil which he named "Cocoaine." In 1858, Phalon, who had for several years manufactured a hair oil from cocoanut, put his up, calling it "Cocoine." The labels are very dissimilar. The only possible likeness is the two words "Cocoaine" and "Cocoine." The court affirmed a judgment giving a perpetual injunction, Bosworth, Ch. J., giving the opinion. Robertson, J., dissented, on the ground, only, that the proofs having shown that the defendant honestly adopted a French word to indicate the origin of the oil, that it was made from the cocoa nut, the case did not come within the rule. He however recognized the rule as before laid down.

In *McCardel* v. *Peck*, (28 *How. Pr.* 120,) the court recognized the rights of the real proprietor of a trade-mark, as the McCardel House, to permit it to be used by others, but held that without a valid agreement, the permission might be revoked.

II. The case here made by the plaintiff was within the rule. The defendant's trustees intended by the use of the word Congress, and the imitations of the various trade-marks used by the former proprietors of the Congress spring, to impose their water upon unwary purchasers as Congress water. 1. Their acts alone would show this; but in addition to that, we have the statement of their superintendent, that this was the reason why they adopted the name. 2. No advantage could result to them from the use of the word Congress, unless it would be to induce purchasers to suppose the waters came from the Congress spring. 3. The pretense set up in the answer, that Mrs. Clarke had sold

the right to use the trade-marks, is answered by the fact that before the defendant had an existence the plaintiff had acquired from the proprietors of the Congress spring the whole property, with the stock of bottles, corks and boxes, with the proprietary marks, and the implements to make such marks upon them. The plaintiff became the owner of the Congress spring, August 5, 1865. The defendant only came into existence September 10, 1866.

III. The court, at special term, erred in vacating the injunction. The prayer of the complaint was to restrain the defendant from the use of the word "Congress," in selling the water it'prepares, and from the use of any of the proprietary marks of the former owners of the Congress spring to induce the belief that the water it sold was Congress water. The plaintiff's claim is that the name Congress water is applicable to no water but the water of the Congress spring, which it owns; that to call any other water by that name, or by any labels or devices which have at any time been used to put up that water, or by an imitation thereof, calculated to deceive the unwary into the belief that it is Congress water, for the purpose of selling it, is a fraud upon the public and upon the plaintiff. In doing this it is not necessary for the plaintiff to show a right to use the marks of former proprietors; it is enough to show that the defendant may not use them to foist his articles on the market as Congress water. If the suggestion that the defendant might purchase and use the proprietary marks of the former owners is correct, then they might put up any sort of water, and use the bottles of Lynch & Clarke, and all their trade-marks, and sell it as Congress water, and thus either destroy the reputation of Congress water, or the plaintiff's business.

The learned justice, at special term, in his opinion, suggests that the plaintiff does not, in the complaint, aver that it purchased, with the Congress spring, the right to

use all the former proprietors' trade-marks. Certainly it is not so stated in terms, and yet it is stated that the plaintiff purchased the *Congress Spring*, with its whole apparatus. No one pretends that it meant to carry on business under the firm of Lynch & Clarke, or either of the former proprietary names. But when it purchased the establishment, it is most manifest that those who sold it had no right thereafter to bottle up any water they chose and sell it as Congress water. The learned justice also alludes to the rule observed by courts, of preventing a plaintiff, by a trademark, from deceiving the public. It is submitted that the same rule applies to the permitting a defendant to deceive the public by using or imitating old trade-marks, not belonging to the article he deals in. It is also stated that the answer alleges that the trade-marks of former proprietors were not assigned to the plaintiff, and that the plaintiff's affidavits fail to furnish evidence to the contrary. Now, first, the answer was only verified on information and belief, and proves nothing; and, second, the affidavit of Johnson shows that a large quantity of bottles and corks, and bottled water, with the trade-marks, and the implements used in making them, were sold to the plaintiff's immediate predecessor.

A suggestion was made by the court, at special term, that the water of the Congress Spring having been called Congress water for over seventy years, the owners thereof have no exclusive right to all mineral waters, and therefore the owners of any spring of a similar water may rightfully call their waters Congress water. No one is shown to have ever known the term Congress water to mean anything but the water of the plaintiff's spring; no one is brought here to swear that any other water was ever sold as such. The defendant's superintendent, McCaffrey, simply swears he expects to prove that Putnam sold waters of his spring as "New Congress." In answer to all this, a large number of the most eminent apothecaries and

dealers in Congress water for the last thirty-five years, distinctly swear that the name has no reference to the quality or constituents of the water, but is simply applicable to the waters of the plaintiff's spring. A large number of the inhabitants of Saratoga, residents there for seventy, fifty, forty, thirty-five, thirty, twenty-five, fifteen and ten years, swear to the same facts—that at Saratoga no other water than Congress Spring water was ever called Congress water. And, in addition to all this, it is shown directly that the defendant's trustees, with their eyes open to the dishonesty and fraud of using it, and simply with intent to deceive the public and supplant the plaintiff's business, adopted it. It was done purposely, fraudulently. It was just such an act as the statute of 1862, (*Laws of 1862, p. 513, ch.* 306,) was intended to prevent.

*W. A. Beach* and *A. Pond,* for the respondent.

I. The plaintiff has acquired no exclusive right to the use of the claimed trade-mark. The terms "Congress Spring," or "Congress Spring *water,*" as applied to a natural element, are not appropriable as trade-marks. 1. To constitute a private trade-mark, it must denote either the origin or ownership of the article to which it is affixed. (*Upton on Trade-marks,* 86. *Amoskeag Manufacturing Co.* v. *Spear,* 2 *Sandf.* 599. *Fetridge* v. *Wells,* 13 *How. Pr.* 385. *Wolfe* v. *Goulard,* 18 *id.* 64. *Burgess* v. *Burgess,* 17 *Eng. Law and Eq.* 257.) The marks and devices claimed by the plaintiff lack these essential qualities. They do not in any sense indicate the origin or property of Congress Spring, or its waters. In the language of Justice Duer, in *Fetridge* v. *Wells,* (13 *How. Pr.* 385,) "they are used to designate the article itself, and have become, by adoption and use, its proper appellation." and are not, therefore, the subject of exclusive appropriation. This is so, eminently, of the words "Congress Spring." Evidently this is but the name of the spring itself, like "Avon Springs," "Lebanon Springs," "Sharon Springs,"

and " Cheltenham Springs." All these are·but the names of particular fountains, indicative only of the place where they issue. They distinguish the several springs, and nothing else. In neither is there any indication of *origin* or *ownership.* Nor is there in the term " Congress Spring water." That is but an arbitrary, inexplicit name, express- ing no idea of property, or origin. Both are descriptive, by application and use, of the properties and qualities of cer- tain mineral waters. 2. If it should be conceded that these terms indicate, in any sense, the *origin* of the spring, or its waters, as produced at a known locality, the plaintiff would not be helped. Because neither Congress Spring nor its water has any peculiar property, or effect, to distinguish it from the spring of the defendant, or its water. The med- icinal qualities of both are substantially the same. The various titles designating the numerous fountains issuing at Saratoga are received as expressing the special attributes of a numerous class of fountains, having a common origin and cognate qualities. Each proprietor has the right to sell the waters, and to designate them by that name which appropriately signifies their common nature. (*Fetridge* v. *Wells,* 13 *How.·Pr.* 355. *Stokes* v. *Landgraff,* 17 *Barb.* 608.) The proprietor of one of the springs at Avon, or Lebanon, or Sharon, or Cheltenham, might sell the waters of either by the name of " Avon water," &c., and with as much propriety as the plaintiff, claim the title as a trade-mark. The region of the Adirondack is renowned for its ores. Could an owner name the production of his bed " Con- gress ore," and use it, until it became descriptive of a cer- tain *quality* or *class* of ore, and enjoin another owner of the same description of ore from vending it by the same name ? Certainly not ; because the term has become a *name* for an article which every owner has the right to sell by its ap- propriate title. 3. It is submitted that the doctrine of trade-marks has never been applied, and is not appli- cable, in letter or spirit, to the sale of spontaneous,

Congress and Empire Spring Co. *v.* High Rock Congress Spring Co.

natural products, of substantially the same nature. It is appropriate only to artificial compounds, or products, originated by the science, or skill or diligence of man. It is designed to protect the inventor of some new combination of substances, or some new product of skill; to secure to him something produced by his own genius, and the market he has secured by merit and industry. (*Upton on Trade-Marks*, 97, 8.) If this be the spirit of the doctrine, it is clearly inapplicable to the sale of natural products. They are not the creations of man's skill or industry. They are the gift of nature to all—free to all to sell and use. If a man adds to, combines or improves them, he may claim the advantage of his enterprise, by attaching to them marks or symbols which express their source and his title; but he cannot bottle, and name, the elements, and claim, exclusively, the new appellation by which they have become known in market. As well might one bottle the pure air of the mountain, naming it "Congress air," and prevent another from selling the same atmosphere, by the same name. The proprietor of the Congress Spring has no merit entitling it to a monopoly of name. Nor has water any such merit. The plaintiff sells what the earth produces. There is nothing in the thing itself, or in the form or mode of sale, originating with the plaintiff. He has discovered, produced, contrived, nothing entitling him to reward. 4. The argument is illustrated and fortified by the circumstance that for more than thirty years the terms "Congress Spring" and "Congress Spring water" have been used to designate another spring, and other mineral water, at Saratoga, other than the plaintiff's. "Putnam's, or New Congress Spring," and "Putnam's, or New Congress Spring water," are names familiar in market. The names are generic, and are applied to all mineral waters at Saratoga, possessing like properties.

II. To justify interference by injunction, the claimed trade-mark must be deceptively used—so as to mislead

ordinary attention. (*Partridge* v. *Menck*, 2 *Sandf. Ch.* 622. *S. C.* 2 *Barb. Ch.* 101. 1 *How. App. Cas.* 547. *Merrimack Manufacturing Co.* v. *Garner*, 2 *Abb.* 318.) Mr. Upton thinks (pp. 220, 221,) that this rule is against the current of authority. But it must be accepted as the rule of this State, until the authority of the Court of Appeals is reversed. Mr. Upton conceives the true rule to be, that an injunction will go when the party fraudulently—with the design to deceive—uses the trade-mark in a manner to impose upon the unwary, although ordinary attention would detect the imposture. Accepting either proposition, the defendant is not amenable. All intention to deceive is disclaimed, under oath, and the mark it uses repels the aspersion, not only, but demonstrates that no one could be deceived. The High Rock Spring has been known as long as the Congress. Independent of its waters, it has been a celebrity from the remarkable petrifaction of its flowing water forming a conical surface curb, with a central orifice. The name attracts attention, at once. It is given a conspicuous place in the title adopted by the defendant. And the device of the rocky cone from which the waters issue, is prominently delineated. No fair mind can attribute to this a purpose to deceive, or consider it an imitation likely to mislead.

III. Whatever hesitation may be felt upon either of these propositions, this is not a case for an interlocutory injunction. The allegations of the complaint, imputing fraudulent imitation and deceptive similitude, are denied. The title of the plaintiff is not clear. It is disputed, upon substantial grounds. Equity will not interfere, under such circumstances. An injunction would be detrimental to the business of the defendant. It would be irreparable, inasmuch as the extent of damage would not be susceptible of legal proof. It is not needed. There is no allegation of irresponsibility. If finally beaten, the defendant is able to respond. The order should be affirmed.

*By the Court,* JAMES, J.   The doctrine of protection to trade-marks is now well established, and in the numerous decisions in this State, in other States and in England, the principles upon which the doctrine is based, have been stated and restated, until they ought to be correctly understood.   "And yet in the application of these principles to particular cases," much difficulty often arises, and in some instances the true principle has so far been lost sight of, as to produce decisions apparently of a contradictory character.   The principle which underlies this doctrine is, that he who by his skill, industry or enterprise has produced or brought into market or service, some commodity or article of use, convenience, utility or accommodation, and affixed to it a name, mark, device or symbol, *which serves to designate it as his,* is entitled to be protected in that designation from encroachment, so that he may have the benefit of his skill, industry or enterprise, and the public be protected from the fraud of imitators.

Property in trade-marks, *is not property* in the words, letters, marks or symbols as things, or as signs of thought, or as productions of the mind, like that of patent or copyright; but simply, and solely property as a means of designating things—the things thus designated being the production of human skill, or industry, whether of the mind, or the hands, or a combination of both; and this property has no existence apart from the thing designated, or separable from its actual use in accomplishing the present and immediate purpose of its being.  (*Upton on Trade-Marks,* 4, 5.)   If this is the true theory—the correct exposition of the principle of the law of trade-marks—it can have no application to a name given to a natural element in its natural state.   I am not aware that the question of the application of the law of trade-marks to names given to spontaneous or natural products has, previous to this, ever come before the courts for adjudication.   All the cases reported are cases where the marks infringed were used and applied to

artificial compounds, products or manufactures originated by the science, skill, diligence or enterprise of man; and in all these cases, the principle of the law is stated and restated as applicable to protect the skill, industry and enterprise of mechanics, manufacturers and inventors; and hence only applicable to artificial products. Thus, in that most important and leading case, *The Amoskeag Manufacturing Co.* v. *Spear*, (2 *Sandf.* 599,) where the characteristics of trade-marks were clearly and fully stated, the court said: "Every manufacturer, and every merchant, for whom goods are manufactured, has an unquestionable right to distinguish the goods he manufactures or sells by a peculiar mark or device." So in *Stokes* v. *Landgraff*, (17 *Barb.* 608,) the court said: "The principle is well settled that a manufacturer may, by a priority of appropriation of names, letters, marks or symbols of the kind, to *distinguish his manufactures*, acquire a property therein as a trade-mark." In this case the court is asked to restrain the defendant from using the word "Congress" in connection with the word "water," or words "spring water." Conceding that the plaintiff, as owner of "Congress Spring," is entitled to the rights of its predecessors in the use of the word "Congress," and that it has heretofore only been used and applied to water in connection with said spring and its water, still, as the water is not an artificial product, and as there is nothing in the mode of bottling or mode of sale originating with the plaintiff or former owners, which the word "Congress" defines, designates or implies, it cannot be said that the plaintiff has any exclusive right to the use of that word in connection with that business, or in connection with the word "water" or words "spring water."

But there is another ground wherein we think the plaintiff fails to show a right to an injunction. "A name can only be protected as a trade-mark when it is used merely as indicating the true origin or ownership of the

Congress and Empire Spring Co. *v.* High Rock Congress Spring Co.

article offered for sale. Never when it is used to distinguish the article itself, and has become by adoption and use its proper appellation. (*Fetridge* v. *Wells,* 13 *How. Pr.* 385.) In the *Amoskeag Manufacturing Co.* v. *Spear,* the court said: "The owner of an original trade-mark has undoubted right to be protected in the exclusive use of all the marks, forms or symbols that were appropriated as designating the true origin or ownership of the article or fabric to which they are affixed; but he has no right to the exclusive use of any words, letters, figures or symbols which have no relation to the origin or ownership of the goods, but are only meant to indicate their name or quality. He has no right to appropriate a sign or symbol, which from the nature of the fact which it is used to signify, others may employ with equal truth, and therefore have an equal right to employ for the same purpose."

And again, in *Stokes* v. *Landgraff,* (17 *Barb.* 608,) the court said: "In all cases where names, signs, marks, brands, labels, words, or devices of any kind can be advantageously used to designate the goods or property, a particular place of business of a manufacturer, or a person engaged in trade, he may adopt and use such as he pleases which are adapted to that end and have not been before appropriated; but in respect to words, marks or devices, which do not denote the goods or property, or particular place of business of a person, but only the kind or quality of the article in which he deals, no property in such words or devices can be acquired."

The word "Congress" in connection with the word "water," or words "spring water," has no relation to, and does not indicate the origin or ownership of the article named. It only designates the article itself; and that designation has become, by adoption and use, its proper appellation. Therefore, within the principle above stated, and the authorities above cited, neither the plaintiff or its predecessors acquired, or could acquire, any property in

the use of said word, or any exclusive right to the use of such word in connection with the word " water," or the words " spring water."

If it were conceded the word " Congress," in the application claimed for it, in this action, was a proper trade-mark, it is extremely doubtful, if upon the case as presented, an injunction could be sustained in favor of the plaintiff, because of want of title in the plaintiff to the right of its exclusive use. In the answer, that right and title is expressly denied, and is averred to be in a third party; and that allegation is not met in the moving affidavits. However that may be, we do not propose to put our decision upon that ground.

The order of the special term is affirmed on the distinct grounds, and for the reasons, above stated.

*First.* That the water of Congress Spring being a product of nature, the law of trade-marks has no application to protect the owner in the exclusive use of a name given to it.

*Second.* Because the word " Congress " neither indicates the origin, ownership, or place of the water, but only designates its name, and, from long use, its quality.

Order of special term affirmed, with $10 costs and disbursements.

[St. Lawrence General Term, October 1, 1867. *James, Rosekrans* and *Potter,* Justices.]