## O'ROURKE *v.* CENTRAL CITY SOAP CO.

*(Circuit Court, E. D. Michigan. December 7, 1885.)*

1. **TRADE-MARK—"ANTI-WASHBOARD" SOAP.**
   The words "anti-washboard," as applied to a manufacture of soap, are suggestive rather than descriptive, and may be lawfully claimed as a trade-mark.
2. **SAME—APPROPRIATING MARK—TITLE—ABANDONMENT.**
   A person cannot appropriate a trade-mark belonging to another, without his consent, and afterwards acquire a good title by the abandonment thereof by the first proprietor.
3. **SAME—DEFECT OF TITLE.**
   A third person may take advantage of this defect of title.

In Equity. On pleadings and proofs.

This was a bill in equity for the infringement of a trade-mark claimed by the plaintiff, in the use of the words "anti-washboard," as applied to a manufacture of soap.

The facts of the case were substantially as follows: In 1872 one Thornton R. Walker took out a patent for a composition of matter said to constitute soap, but which did not designate the compound by any name except an "improved soap." About that time, Walker and his partners, doing business under the name of "Anti-washboard Soap Company," at Cary, Ohio, made and sold a soap which they called "Anti-washboard Soap," and which was described as possessing such qualities as would make rubbing unnecessary in the process of washing clothes. Whether it was made according to the formula patented by Walker did not appear. This firm ceased business about 1874, and in that year sold its kettles and apparatus to Clark & Benefiel, of Mattoon, Illinois, by whom soap was made and sold under the same name at Mattoon until August, 1875, when the business was sold by them to one Stephens, who, after carrying it on for three or

four months, died. With his death, the business, and the use of the name "Anti-washboard" by any one succeeding to the business, of the Anti-washboard Soap Company ceased. One of the members of the original firm doing business at Cary had in the mean time moved to Kansas, and on May 12, 1884, after this suit was begun, executed to the defendant an assignment of the right to use the words "Anti-washboard" as a trade-mark. This was the only right claimed by the defendant to the use of these words. The defendant was shown to be a manufacturer of soap in large quantities at Jackson, in this state, with the words "Anti-washboard" impressed upon the bar and wrapper.

The soap manufactured by the Anti-washboard Soap Company, at Cary, Ohio, was sold extensively throughout the country, and in January, 1875, one Winger, who it was shown had seen this soap, and knew of the trade-mark, began the manufacture of a soap at Sturgis, in this state, under the name of "Winger's Anti-washboard Soap." He claimed, however, to have been informed that the business of the Anti-washboard Soap Company had been discontinued. This was about the time that the Anti-washboard Soap Company had sold out to Clark & Benefiel, of Mattoon, and about a year before their business was discontinued, and the trade-mark abandoned by them. Winger carried on business at Sturgis in a very small way from 1874 to September, 1883, when he deposited his trade-mark, "Winger's Anti-washboard Soap," for registration in the patent-office, and it was duly registered October 23, 1883. A few days thereafter he assigned to the plaintiff the "exclusive right to use, in the manufacture and sale of soap," this trade-mark. He also turned over to them his receipt for making soap, but no part or interest in his business. His kettles, staves, cutting boxes, and other apparatus used in making soap he removed to Kansas, where he took up his residence. Soon thereafter the plaintiff began an extensive manufacture of soap at Fort Wayne, Indiana, under the name of the "Summit City Soap Company," using the Winger trade-mark, and in 1885 began this suit for an injunction and an accounting. The defendant began the use of this trade-mark in July, 1880, but Winger was not informed of it until March, 1881.

*R. S. Taylor,* for plaintiffs.

*R. Mason,* for defendants.

BROWN, J. Two prominent objections are made in this case to the monopoly by the plaintiff of the words "anti-washboard" as applied to soap: *First,* that the words are descriptive of the quality of the article, and hence cannot be made the subject of a trade-mark; and, *second,* that they are not original with the plaintiff, but were unlawfully appropriated by him.

1. As a general rule, there is no doubt that, in order that mere words may be upheld as a trade-mark, they must be purely arbitrary,

or must indicate the origin or ownership of the article or fabric to which they are affixed. Words expressive of the character or composition of an article, or of the name by which it is generally known in the market, cannot be made the subject of monopoly. *Burton* v. *Stratton*, 12 Fed. Rep. 696, 700, and cases cited. There is, however, a class of words which, though not descriptive of the article, are suggestive of some supposed advantage to be derived from using it, or some effect produced by its use. These have been ordinarily, though not always, upheld as valid trade-marks. Examples of such as have been sustained are "Painkiller," as applied to a medical compound, (*Davis* v. *Kendall*, 2 R. I. 566; S. C., Cox, Trade-mark Cas. 103;) "Invigorator," as applied to a bed-bottom, (*Ex parte Heyman*, 18 O. G. 922;) "Samson Brace," as applied to suspenders; "Blood-searcher" and "Annihilator," as applied to medicines, (*Fulton* v. *Sellers*, 4 Brewst. 42;) "Zero," to a water-cooler; "Arctic," to a soda fountain; "Day-light," "Sun-light," and "Gas-light," to illuminating oils, (Browne, Trade-marks, § 273.)

The words "Anti-washboard" are not objectionable, as indicating the composition or quality of the article, although the natural inference from them is that by the use of the soap the necessity of rubbing clothes is obviated. Upon the whole, we incline to the opinion that they are rather suggestive than descriptive, and that they may be properly claimed as a trade-mark.

2. The second objection presents a question of somewhat more difficulty. It has been sometimes said that the owner of a valid trade-mark must have been the first to appropriate the name to that particular article, and this, to a certain extent, is true; but if the trade-mark be abandoned, or the use of it intentionally discontinued by the original proprietor, it may be readopted and appropriated by another, provided it has not become a mere description of quality or kind of product. Browne, Trade-marks, § 690, 252; *Durham Smoking Tobacco Case*, 3 Hughes, 151; *Atlantic Milling Co.* v. *Robinson*, 20 Fed. Rep. 217.

In the case under consideration, however, the question is presented whether a person may appropriate a trade-mark belonging to another, and subsequently acquire a good title thereto by the abandonment thereof by the first proprietor. The testimony shows, and it is not disputed, that when Winger began manufacturing soap at Sturgis, under the name of "Winger's Anti-washboard Soap," the firm of Clark & Benefiel was manufacturing soap at Mattoon, Illinois, under the same name, and continued so to do for nearly a year after Winger commenced business. During this time he was an admitted trespasser upon their rights. The fact that he supposed the Ohio firm had gone out of business is no defense if in fact they had an exclusive right to the trade-mark. *Millington* v. *Fox*, 3 Mylne & C. 338; *Welch* v. *Knott*, 4 Kay & J. 747; *Leather Cloth Co. Case*, Cox, Trade-mark Cas. 223.

There is no evidence in this case that his competition interfered with the business of Clark & Benefiel, or Stephens, their successor, or that he was the cause of the subsequent abandonment of the business by them, but if it be once conceded that a person may acquire a good title to a trade-mark by appropriation, without the consent of the lawful owner, it would enable a manufacturer, by the use of large capital or superior energy, to drive competitors out of business, by seizing their trade-marks, and using them for that very purpose, provided the lawful owner is unable or unwilling to assert his rights by resort to the courts. We think that no court would hesitate to pronounce against a title so obtained. We find it difficult to distinguish such a case, in principle, from the one under consideration, as it might be impossible to prove that the lawful owner was compelled to discontinue by reason of such competition.

We see no objection to the defendant availing itself of this defense. To maintain their bill for an infringement the plaintiffs are bound to show an exclusive right to the use of this trade-mark. If it appears that the words were in common use to designate the article of manufacture, or if the exclusive right to use them was vested in another, we apprehend that the plaintiffs are no more entitled to an injunction than is the patentee of an invention who fails to show that he is the first and original inventor of the thing patented. *Wolfe* v. *Goulard,* 18 How. Pr. 64; *Manhattan Medicine Co.* v. *Wood,* 14 O. G. 519; *Congress & E. S. Co.* v. *High Rock Co.,* 57 Barb. 526.

In this respect, both stand in the position of a plaintiff in ejectment, who must recover upon the strength of his own title, and not upon the weakness of the defendant's. Indeed, it is a good defense to an ordinary action of replevin that the right to the possession of the property is in a third person. *Dermott* v. *Wallach,* 1 Black, 96; *Schulenburg* v. *Harriman,* 21 Wall. 44. The fact that defendant has no better right to the use of the trade-mark than the plaintiff would certainly not entitle the latter to an injunction.

Upon the whole we have come to the conclusion that the plaintiffs never acquired an exclusive right to the use of the words "anti-washboard," and that their bill should be dismissed.