# SUPERIOR COURT.

## William P. Fetridge agt. Frederick C. Wells and others.

A *label* or *trade-mark* which, from its general resemblance to the original, is well calculated to mislead the public, by inducing the belief that the articles to which it is affixed are, in reality, prepared or manufactured by the original owners, and which, from its close and minute imitation of the original, was evidently framed with a design to mislead and deceive, may, in a proper case, be restrained in its use by *injunction*.

A *variation* must be regarded as *immaterial* which it requires a close inspection to detect, and which can scarcely be said to diminish the effect of the *fac-simile* which the simulated label, in all other respects, is found to exhibit.

A "*name*" may, in some cases, be rightfully used and protected as a *trade-mark*, but this is only true when the name is used merely as indicating the true *origin* or *ownership* of the article offered for sale—*never*, where it is used to designate the *article itself*, and has become, by adoption and use, its *proper appellation*,

For instance, when a new preparation or compound is offered for sale, a distinctive and specific *name* must necessarily be given to it. This name, no matter when or by whom imposed, becomes by use its proper appellation; and all who have an equal right to manufacture and sell the article, have an equal right to designate and sell it by its *appropriate name, provided* each person is careful to sell the article as prepared and manufactured by *himself*, and not by another.

An *exclusive right* to use, on a label or other trade-mark, the *appropriate name* of a manufactured article, exists only in those who have an *exclusive property in the article itself.* (*See* 3 *Sand.* 599.)

If a plaintiff comes into a court of equity to claim relief against the *fraud* of others, he must be free himself from the imputation. If the sales of an article made by the plaintiff are effected, or sought to be, by misrepresentation and falsehood, he cannot be listened to when he complains that, by the fraudulent rivalry of others, his own fraudulent profits are diminished. An exclusive privilege for *deceiving the public*, is not one that a court of equity can be required to aid or sanction. (*This decision on this point, follows that in Partridge agt. Menck*, 1 *Howard's Court of Appeals Cases*, 547.)

The above principles applied to this case, where it appeared that the plaintiff and his firm, who were endeavoring to restrain the defendants from doing the same thing, were largely engaged in manufacturing and selling an article of *liquid soap*, (made of palm-oil, pot-ash, alcohol and sugar,) highly scented, under the seductive name of "*Balm of Thousand Flowers.*"

*New-York Special Term, Feb.,* 1857.

THIS is a motion, on the part of the defendants, to dissolve an injunction which was granted by Mr. Justice HOFFMAN, and by which the defendants are restrained from selling, or offering for sale, directly or indirectly, any preparation or compound manufactured by them, or by either of them, or by any other person or persons other than the plaintiff or the firm of W. P. Fetridge & Co., under the name, &c., of "Balm of Thousand Flowers;" or selling, or offering for sale, any preparation or compound having printed, painted, written, or stamped on the bottles containing the same, the words, "Balm of Thousand Flowers;" or having or using any label or wrapper, printing or device, in such manner as to be a colorable imitation of those used by the plaintiff, or by the firm of William P. Fetridge & Co., to designate or distinguish the plaintiff's preparation or compound, usually known as "Balm of Thousand Flowers."

SEWARD & BROWN, *for defendants.*
VANDERPOEL & STOUGHTON, *for plaintiff.*

DUER, Justice.   This is a case, apparently, of great interest to the parties, and has been very fully and ably argued by their respective counsel; and, in compliance with their wishes, I have attentively considered all the questions which it involves, although in relation to many of them it will not be necessary nor expedient that I should now express or intimate an opinion.

Without rejecting the evidence of my senses, I cannot doubt that the label or trade-mark which the defendants admit that they propose to use, from its general resemblance to that of the plaintiff and his firm, is well calculated to mislead the public, by inducing the belief that the articles to which it is affixed are, in reality, prepared or manufactured by the plaintiff's firm. Nor can I doubt that the label was framed with this design, since the imitation is so close, minute and exact as, in my opinion, to exclude the supposition of any other motive.

It is true, that the name of R. H. Rice, as proprietor, is

printed on the label, but it is so printed as not to attract, but almost certainly to elude observation. A variation must be regarded as immaterial which it requires a close inspection to detect, and which can scarcely be said to diminish the effect of the fac-simile which the simulated label, in all other respects, is found to exhibit. Hence, were this the only question in the case, I should have no difficulty in holding that the injunction, which is sought to be dissolved, must, to some extent, be retained and enforced; but, it is proper to add that, upon no supposition would I consent to retain it for all the purposes for which it has been granted, and for which its continuance has been asked.

The position, so strenuously insisted on, that the plaintiff's firm have an exclusive property in the words, "Balm of Thousand Flowers," or, which is the same thing, an exclusive right to use those words in a trade-mark, I wholly reject.

It is not necessary to deny that a name may, in some cases, be rightfully used and protected as a trade-mark; but this is only true when the name is used merely as indicating the true origin or ownership of the article offered for sale; never, where it is used to designate the article itself, and has become, by adoption and use, its proper appellation. When a new preparation or compound is offered for sale, a distinctive and specific name must necessarily be given to it.

The name thus given to it, no matter when or by whom imposed, becomes by use its proper appellation, and passes as such into our common language. Hence, all who have an equal right to manufacture and sell the article, have an equal right to designate and sell it by its appropriate name, the name by which alone it is distinguished and known, provided each person is careful to sell the article as prepared and manufactured by himself, and not by another. When this caution is used, there is no deception of which a rival manufacturer, not even the manufacturer by whom the distinctive name was first invented or adopted, can justly complain; and so far from there being any imposition upon the public, it is the use of the distinctive name that gives to purchasers the very information

which they are entitled to have. In, short, an exclusive right
to use, on a label or other trade-mark, the appropriate name of
a manufactured article, exists only in those who have an exclu-
sive property in the article itself, and it is not pretended that
the plaintiff or his firm have any exclusive property in the
preparation or compound to which the well-sounding name of
"Balm of Thousand Flowers" has been given. It is only the
seductive name that they claim as their exclusive property, and
doubtless, from their experience of its value in the extension of
their sales. This, however, is a species of property that, in my
opinion, is unknown to the law, and that can only be given to
one by an infringement of the rights of all.

My views on the general question of an exclusive right to
sell an article by its distinctive name were fully expressed in
the case of *The Amoskeag Manufacturing Company* agt. *Spear*,
(2 *Sand. R.* 599,) and, as I think it is there shown, are sus-
tained by an express decision of the king's bench in *Singleton*
agt. *Bolton*, (3 *Doug.* 293,) of the Vice-Chancellor PLUMER in
*Canham* agt. *Jones*, (2 *Ves. & Beames*, 218,) and of the chan-
cellor, Lord COTTENHAM, in *Millington* agt. *Fox*, (3 *Mylne &
Craig*, 338.)

It is true, there are some observations of the master of the
rolls in *Perry* agt. *Inofitt*, (6 *Beavan R.* 66,) that seem to favor
an opposite doctrine ; but when that case is examined, it will
be found that the plaintiff claimed an exclusive property, not
merely in the name, but in the composition to which it was ap-
plied ; and it is admitted, and is sufficiently obvious, that an
exclusive property in the subject carries with it, in all cases,
an exclusive right to the use in a trade-mark of its appropriate
name.

The remarks that I have now made would suffice for the de-
cision of this motion, were the only question that of the simi-
larity of the trade-marks ; but there is another, and a grave and
important question, to which the counsel for the defendants
have earnestly directed my attention : that question is, whether,
even upon the supposition that all the material allegations in
the complaint are true, the conduct and proceedings of the

Fetridge agt. Wells and others.

. plaintiff and his firm have not been such as justly to preclude them from any claim to relief in a court of equity. This question, it is true, is not raised in the answer of the defendants, but it is raised by the facts which the affidavits and other papers before me have disclosed, and, in my opinion, it is emphatically the question that, as a judge in equity, I am bound to consider and determine.

It may be true, that the defendants, if permitted to use in their contemplated sales a trade-mark apparently the same as that of Fetridge & Co., would commit a fraud upon the plaintiff and upon the public; but if the plaintiff and his firm are themselves engaged in the execution of a systematic plan for deceiving the public; if they have been and are endeavoring, constantly and daily, to multiply their sales and swell their profits by false representations of the composition, qualities and uses of the liquid compound which they invite the public to buy, it is strenuously insisted that a court of equity would violate its principles and abuse its powers by consenting to aid them by an injunction or otherwise, in accomplishing their design; and to this proposition I yield my fullest assent.

Those who come into a court of equity seeking equity, must come with pure hands and a pure conscience. If they claim relief against the fraud of others, they must be free themselves from the imputation. If the sales made by the plaintiff and his firm are effected, or sought to be, by misrepresentation and falsehood, they cannot be listened to when they complain that by the fraudulent rivalry of others their own fraudulent profits are diminished. An exclusive privilege for deceiving the public is assuredly not one that a court of equity can be required to aid or sanction. To do so would be to forfeit its name and character.

It is, therefore, a necessary inquiry whether the privilege, which the plaintiff now claims, may be protected by the court, is of this character; and in pursuing the inquiry I shall confine myself to facts that are certainly material, and are undeniably proven.

*First,* then, as to the name of the precious compound for

which this contest is waged—" Balm of Thousand Flowers "—
it is euphonious and attractive; but was it honestly given, and
is it honestly used? Is it calculated to deceive the public, and
is it with this view that it was first imposed and is now em-
ployed? or is it an unmeaning and harmless coinage, by which
none are misled, or were meant to be misled? Is it a repre-
sentation, intentionally false, of the composition and qualities
of the preparation offered for sale? or am I to believe, as the
able counsel for the plaintiff endeavored to persuade me, that
it is what he termed a fancy name, having no reference what-
ever to the nature and qualities of the subject to which it ap-
plies, and therefore a name by which none are, were meant to
be, or can be deceived?

Now, as to the answers which truth and the evidence before
me require to be given to these questions, I have no doubt. That
the name, "Balm of Thousand Flowers," is, in one sense, a
fancy name, may be at once admitted; that it is so in the sense
of the plaintiff's counsel I do not and cannot believe. On the
contrary, I am fully convinced that the name, "Balm of Thou-
sand Flowers," was invented, and is now used to convey to
the minds of purchasers the assurance that the highly scented
liquid to which the name is given is, in truth, an extract or dis-
tillation from flowers, and therefore not merely an innocent,
but a pleasant and salutary preparation. Not only is this the
meaning that the words used naturally suggest; but in my
opinion it is that which they actually and plainly express, and
were designed to convey.

The word " balm " is certainly not a fancy phrase. It has a
clear and definite meaning. In its literal and proper sense, as
distinguished from its metaphorical, it means an aromatic vege-
table juice, whether extracted from trees, shrubs, or flowers.
(*Webster's Dictionary—words* balm *and* balsam; *Johnson's ditto.*)
Substitute, then, the definition for the word, and we have, on
every label on the bottles which the plaintiff sells, a positive
assertion that the liquid inclosed is the aromatic juice of un-
numbered flowers. It is said, that we cannot suppose that the
words " thousand flowers " were meant to be literally under-

stood; but it by no means follows that the entire name, of which they are a part, is, therefore, fanciful and unmeaning. The word "thousand," I do not doubt, is used and is understood in a sense in which its use is familiar and frequent—that is, as designating a large and indefinite number.

Not only is the meaning I have stated that which the name, "Balm of Thousand Flowers," naturally suggests, and, as I think I have proved, actually expresses, but we have the clearest evidence that it was for the purpose of conveying this meaning to the mind of the public that the name was first chosen by the inventor of the compound, and that it is for the same purpose that it has been retained, and is now employed by the plaintiff and his firm.

The inventor is a French chemist, Dr. Le Fontaine, of New-Haven, and his affidavit is among those that the defendants have produced. He says, in terms, that he "especially chose the name, 'Balm of Thousand Flowers,' because, at the time, he used, in the manufacture of the compound, honey, which being a natural balm extracted from a thousand flowers, he considered the name very appropriate." A plain confession that he chose the name as signifying and asserting the fact, that the balm was an extract from flowers, and that he used honey to justify his choice and the assertion. The use of honey was very soon discontinued, so that the pretext which it provided for the use of the name has, for many years past, ceased to exist.

But although Fetridge & Co., whom the plaintiff represents, have found it convenient to drop the use of honey, they have carefully retained, and are striving anxiously to retain the significant name—the adoption of which the ingredient of honey served to excuse; and they have, moreover, taken effectual means to remove any possible doubt as to the meaning in which they wish that the name shall be understood by all by whom their compound is purchased. Around every bottle which they sell, and within the outside label, a printed paper, entitled "Directions"—(to the contents of which I shall hereafter more fully advert)—is carefully wrapped, and passes into the hands

of every purchaser. In this paper they add, to the very elaborate statement of the manifold and almost miraculous virtues of the "Balm of Thousand Flowers," these words: "It is an innocent, safe and efficacious compound of purely vegetable, medicinal and powerful substances, and *the very balm and extract of healing blossoms.*"

Neither my attention nor that of the counsel was directed to these words on the hearing, but it is plain that they put an end to the refuge of a fancy name as an escape from the charge of an intention to deceive. They are a direct assertion that the compound is, as its name imports, an extract from flowers. Is this assertion true, or is it a representation to the public, intentionally false, of the composition and qualities of the compound to which it refers? The necessary answer is readily given, for it so happens that here also the evidence is conclusive.

When Le Fontaine sold to the plaintiff his recipe for manufacturing his balm, he sold it as a secret; but in the course of these proceedings the secret has been disclosed, and the original receipt, confirmed by the oath of Le Fontaine, and not denied by the plaintiff, is now before me.

It appears, then, that this pretended balm is produced by a mixture, in certain fixed proportions, of palm-oil, ley, or pot-ashes, alcohol, and sugar; and that when this mixture has, by the operation of fire, been fully compounded and prepared, it is rendered fragrant, doubtless to favor the deceit of its name, by the addition of some strong perfume, such as lemon or burgamot, lavender or musk. The result is, that this "Balm of Thousand Flowers," extracted from blossoms, redolent of health, is a soap—a liquid soap—highly scented, it is true, and it may be, as a soap, useful and valuable, but still a soap, possessing the usual and known qualities of soap—and nothing more.

The proof is, therefore, complete, that the name was given and is used to deceive the public; to attract and impose upon purchasers; that, in the sense that the plantiff means it shall convey, it is a representation to the public that he finds to be useful and knows to be false.

Fetridge agt. Wells and others.

Let it not be said, that it is of little consequence whether this representation be true or false. No representation can be more material than that of the ingredients of a compound which is recommended and sold as a medicine. There is none that is so likely to induce confidence in the application and use of the compound, and none that, when false, will more probably be attended with injurious, and perhaps fatal consequences.

Nor is it possible to excuse or palliate the proceedings of the plaintiff by saying that there is no reason to believe that the deception which he has practiced has been successful—for that it has been eminently successful I cannot doubt. Of the extent to which the public has been deceived, the immense sales which, it is stated, have been made, the value which the plaintiff attaches to the name, " Balm of Thousand Flowers," and his anxiety and determination to retain, if possible, its exclusive use, seem alone a conclusive proof. He has spent, it is said, and profitably spent, more than one hundred thousand dollars in advertising his compound for sale : but had he dropped its fictitious and deceptive name, and advertised it by its true name of a " liquid soap," and had made known to purchasers that its main ingredients were those blossoms of health, oil, ashes, and alcohol, I apprehend that this large sum would not have been expended at all, or would have been expended in vain. Strip his compound of its false and borrowed name, its imaginary blossoms—reduce it from a balm into a soap, and its sales would be those of a soap—not of a quack medicine held forth to the world as curing nearly all the diseases that " flesh is heir to."

I have said enough to justify the decision I am prepared to make ; but there are other facts to which, in the full discharge of my duty, I deem it necessary to advert ; and in cases of this description, there is a duty owing to the public as well as to the parties.

It is painful to say that, in the mode of acquiring his title, the plaintiff was guilty of a deliberate attempt to deceive the public ; but such is the fact. The written agreement between him and Le Fontaine, whose recipe he purchased, is in evi-

dence before me.   It states that the consideration of the trans-
fer was the sum of $7,500, to be paid in cash, and that of
$2,500 in promissory notes, falling due at different periods;
and on the day following the date of this agreement, the plain-
tiff published an advertisement in one or more newspapers at
Boston, where he then resided, stating that he had purchased
from the inventor the " Balm of Thousand Flowers," for the
price of ten thousand dollars.

This statement, although not wholly false, was a very gross
exaggeration.   Of the $7,500 to be paid in cash, not one dollar
was paid, or ever meant to be paid.   The $2,500 in notes was
the whole consideration of the transfer.   The facts are proved
by Le Fontaine and others, and are not controverted.   The
intent of the transaction is evident.   The advertisement was
published to create a false impression of the real value of the
purchase.   The agreement was framed to silence the doubts of
those who might choose to inquire, and to be used as conclusive
proof that the advertisement was true.   I will not say that the
title thus acquired is not valid in law, but I cannot believe
that it deserves to be aided by an injunction from a court of
equity.

I pass now to the paper of directions, which, as I have al-
ready said, is wrapped round every bottle that the plaintiff
sells, and therefore goes into the hands of every purchaser.
The representations which it contains are made by the plaintiff,
and if false, are certainly entitled to no more favorable con-
struction than if made orally instead of being printed.

This paper is a very singular and, I would fain hope, a
*unique* document, and its tone, intent and character will be
fully shown by the few choice extracts that I propose to make.
It begins thus,—

" The Balm of Thousand Flowers is a delightful compound,
highly and delicately scented by its own *ingredients*—[doubt-
less not meaning ashes and alcohol, but its ' healing blossoms.']
It imparts beauty, comfort and health to the skin, which, by
persevering in the directions, will become and remain free
from all blemishes and imperfections, and precisely as nature

intended it to be, preserving a juvenile appearance even to middle or old age."

Again :—

"It effectually cures pimples, blotches, chilblains, all kinds of eruptions, ulcers, wounds, cuts, burns, ring-worms, erysipelas, and St. Anthony's fire, and is a sovereign remedy for canker in the mouth, or elsewhere."

So much for the skin. Now to the miracles that the balm works upon the hair :—

"This highly perfumed balm gives life to the hair, an unsurpassed gloss is imparted to it, and it becomes beautifully curled and firm. It promotes its increase and nourishes its roots. *It insures with certainty a new growth of beautiful hair to those who even for years, by sickness or otherwise, have been deprived of it.* It prevents the hair from changing its natural color, and becoming white or gray."

As to the teeth, the promises are not quite so large ; they will merely, if fulfilled, put an end, in a measure, to the occupation of dentists by rendering and preserving the teeth perpetually white and perpetually sound. "It quickly renders them white as alabaster, removes the tartar, prevents ulceration, and prevents their decay." It is to the young, however, that this priceless balm offers its choicest gifts and blessings—increase of strength, unfading beauty, and never-ending youth. Its use will give to the young,—(I give the exact words,)—"a luxury, an antidote and a cure of diseases ; they will increase in energy, be full of elasticity, health and beauty, and *be mirrors of admiration.*"

Enough :—all that I have quoted may possibly be true ; but if so, it would seem, that so long as the "Balm of Thousand Flowers" may be procured, it will be a folly to grow old, and a mistake to die.

The able counsel for the plaintiff, to whom I always listen with pleasure, and not unfrequently with instruction, approached skilfully this part of his case, and treated it with much ingenious pleasantry. That his client's praises of the "Balm of Thousand Flowers" were somewhat extravagant, he was far from deny-

ing; on the contrary, he insisted that their very extravagance was proof that they were harmless, and were rather fitted to provoke mirth than criticism and censure; and it must be admitted that it would be difficult, even for a judge of the most approved and habitual gravity, to read this paper of directions without a smile. But we cease to smile when we remember that these falsehoods —for such they are—are printed and circulated with the intent that they shall be believed; and that, in fact, there are thousands upon thousands who read them and believe. We cease to smile when we remember that the plaintiff, who boldly claims the aid of a court of equity, is filling his pockets by abusing the credulity of the young, the inexperienced, the weak and the ignorant, and that he resorts to misrepresentation and falsehood to induce those to purchase who would not otherwise buy, and those who buy to give a higher price than they would otherwise pay. If this is not deceiving and defrauding the public, what is?

I have seldom deemed it necessary to cite authorities when there is a clear, plain, firm ground of principle to stand upon; and I know that I stand upon this ground in holding that this injunction ought to be dissolved. Still, there are a few cases to which, as containing a very distinct recognition of the principle upon which I act, it may be expedient to refer, remarking at the same time, that in not one of them were the misrepresentations that were held to bar the plaintiff's claim to relief, by any means as serious and aggravated as those which it has been my duty to expose.

In the case of *Piddings* agt. *How*, (8 *Simons' R.* 479,) the plaintiff, who was a dealer in tea, sold a mixture of different teas, which he prepared, under the name upon the label, which was his trade-mark, of "Howqua's Mixture." The defendant stole the name and the label, and affixed them to a mixture of his own. The plaintiff, however, in advertising his mixture for sale, had made a false representation of the mode in which it was procured, and of the teas of which it was composed, and upon this ground alone the injunction which he had obtained was dissolved. The vice-chancellor, in delivering his judg-

ment, said, " There has been such a degree of representation that I take to be false, about the mode of procuring and making up the plaintiff's mixture, that in my opinion a court of equity ought not to interfere to protect him. As between the parties, the course pursued by the defendant has not been a proper one; but it is a clear rule laid down in courts of equity, not to extend their protection to persons whose case is not founded in truth."

In the case of *Perry* agt. *Trufelt*, (6 *Beavan's Rep.* 66,) the master of the rolls referred, with marked approval, to this doctrine of the vice-chancellor, and in the case before him denied the injunction, and dismissed the bill mainly on the ground that the plaintiff had falsely represented that the "medicated balm" which he sold, was the invention of a German chemist of known skill and great celebrity.

I cannot believe that the master of the rolls, in the subsequent case of *Holloway* agt. *Holloway*, (13 *Beavan's Rep.* 213,) the authority which was chiefly relied on in the argument before me by the plaintiff's counsel, meant to overrule the cases I have cited, since, in his opinion, he omitted to refer to them; but if *Holloway* agt. *Holloway* is to construed, as it has been contended it ought to be, as an express decision that the vendor of a quack medicine may publish whatever falsehoods he may please to invent, in relation to the composition and virtues of his nostrum, and yet claim protection for his sales in a court of equity, I can only say, that it is a doctrine I cannot and will not follow.

I prefer to follow the doctrine of our court of appeals in *Partridge* agt. *Menck*—a case which is only reported in Mr. Howard's volume of appeal cases. (*Howard's Appeal Cases, p.* 547.) The plaintiff in this case was a manufacturer of matches, and he printed in his label on his boxes the words, "A. Golsh's Friction Matches," thus falsely representing Golsh to be the manufacturer; yet, in truth, in doing this, he was guilty of no fraud, either upon Golsh or upon the public. Not upon Golsh, for he had purchased Golsh's secret, and was licensed to use his name: not upon the public, for the matches were as good

as those which Golsh himself had manufactured—being made by the very process which he had used. Purchasers, although deceived, were not defrauded; yet the manifest intention of the plaintiff to deceive the public was held to be of itself a sufficient reason for denying him the relief which he claimed ; and Mr. Justice GARDINER, in delivering his opinion, expressed himself, as he was wont to do, in a few weighty words :—

"The privilege of deceiving the public," he said, "even for their own benefit, is not a legitimate subject of commerce ; and at all events, if the maxim that he who asks equity must come with pure hands, is not altogether obsolete, the complainant has no right to invoke the extraordinary jurisdiction of a court of equity in favor of such a monopoly."

Certainly the plaintiff in the present case has no better right, and hence the injunction that, if continued, would secure to him such a monopoly, must be dissolved. The motion for its dissolution is, however, granted without costs, since, although the plaintiff might be justly required to pay costs, the defendants have certainly no title to receive them.

They represent Rice, whose conduct and proceedings have been just as blameable as those of the plaintiff: there is not a shade of difference between them.