# WASHINGTON COUNTY.

## A. CARMICHEL & CO. *vs.* LATIMER, STILLMAN & CO.

### IN EQUITY.

A. C. & Co., being the successors by purchase of Stillman & Co., woollen manufacturers, continued to use "Stillman & Co." as a trade-mark on their ticket for goods. Latimer, Stillman & Co., the lessees of a mill formerly used by Stillman & Co., known both as the "Stillman Mill" and as the "Seventh Day Mill," used "Stillman Mills" as a trade-mark. On a petition for an injunction, brought by A. C. & Co. against Latimer, Stillman & Co. to prevent their so using the word "Stillman," it appearing that no deception could be charged on either complainants or respondents, and that no person of the old firm of Stillman & Co. was a member of the firm of A. C. & Co.: —

*Held,* that the injunction could not be granted.

*Held,* further, that a manufacturer has the right to label his goods with his own name or that of his mill, if no fraudulent purpose is intended.

*Query.* If a trade-mark whose reputation depends on the excellence of the manufacture, or the skill and honesty of the manufacturer, can be legally assigned?

*Query.* If the English practice of retaining a firm name, when no original partner remains, is generally recognized in American law?

BILL IN EQUITY charging that the complainants used a ticket containing the words "Stillman & Co." as a trade-mark for their woollen goods, and that the respondents, manufacturers of woollen goods, some of which were like those of the complainants and some inferior to them, used on their goods a ticket resembling the complainants' ticket, and containing the words "Stillman Mills," with intent to defraud the complainants and the public.

The case was heard on a motion to enjoin the respondents from using the words "Stillman" on their trade ticket. The facts are stated in the opinion of the court.

*Providence, November* 11, 1876. POTTER, J. The bill alleges that, from July 1, 1864, to April 1, 1871, George G. Still-

man, Amos Stillman, Jonathan P. Stillman, Thomas V. Still-man, Albert Stillman, and A. Carmichel were partners by the style of Stillman & Co., in manufacturing linseys, using on their goods a ticket or label containing " Stillman & Co." on it as a trade-mark, and that they had acquired a considerable reputa-tion for said goods.    Albert died April 1, 1871, and his share was bought out by Amos, Jonathan, and Thomas, and the firm continued to November, 1871, when George bought the right to said ticket, and continued to manufacture until July 6, 1875, when he sold said ticket to the plaintiffs, whose firm consisted of A. Carmichel, William B. Lawton, George Carmichel, Jr., and W. P. Barney.    The plaintiffs made two varieties of lin-seys, and their goods were known not only as Stillman & Co.'s linseys, but as Stillman linseys, and had kept up the reputation of the goods.    And it is further alleged that the defendants (whose firm, consisting of Robert F. Latimer, James Stillman, and Alexander Jaffrey, was formed August, 1874) had begun in July, 1876, and were continuing to make linseys — some like plaintiffs' and some inferior, and with a fraudulent design to injure the plaintiffs and the public, and knowingly and wrong-fully, either with intent to defraud, or without such intent, put upon them a label or trade-mark, in imitation of that of the plaintiffs', whereby the public are liable to be, and are, de-ceived, and the plaintiffs deprived of great profit, &c.

A suit at law was commenced in August, 1876, and the bill containing the foregoing allegations was filed August 11, 1876. An injunction having been granted until the hearing, a motion for preliminary injunction was heard before Matteson, J., and by him refused, and the matter has now been argued at great length before the full court.

It appears, from the affidavits and papers filed, that, in 1841, Jonathan P. and Amos Stillman bought of O. M. Stillman the mill at Westerly, or Pawcatuck Bridge (but on the Stonington side of the river), and, in 1843, fitted up a part of it for man-ufacturing linseys, and that they continued the manufacture of them there, under various changes of firm, until 1873.    Part of the time Jonathan and Amos were alone; they subsequently took in Thomas V., son of Jonathan, and Albert Stillman.    After the fire, in 1860, the mill was rebuilt, and the old firm took in

Welcome Stillman, under the style of Stillman & Co. On the death of Welcome, in 1864, his son, George G., came in. On the death of Albert, in 1871, his interest was bought by some of the partners, and the firm so remained until November 10, 1871, when it was dissolved, and the old members (excepting George), together with Berry and Stanton, formed a new firm, by the name of Stillman, Stanton & Co., which continued until December 5, 1872. In June, 1874, Berry and Stanton foreclosed a mortgage they held on the mill, and, taking possession, leased it to the defendants, or one of them, who had formed a firm for manufacturing about that time.

The plaintiffs' firm was formed in 1873. Carmichel had been superintendent of the mill for Stillman & Co., and was also with Stillman, Stanton & Co. until they stopped.

Have the complainants such a title to the label or design which they use on their goods as to prevent others from using it, and, if so, have the defendants violated this right by using it, or one so similar that a court of equity ought to interfere ?

The complainants claim it on three grounds : —

*First.* From Carmichel having formerly been a partner with Stillman & Co.

We cannot find, upon the facts as stated by the complainants, that he was ever a partner in the old concern. His name does not appear in the notice of dissolution. He received a portion of the profits as compensation for superintendence. And, furthermore, if he was a partner, upon the dissolution of that firm, in November, 1871, the right to this trade-mark, if of any value, was sold out to another person, viz., George G. Stillman.

*Second.* That he purchased the right to use it from George G. Stillman, one of the old firm, who had bought it on the dissolution.

*Third.* By prior user. The complainants rest their claim on their right to use the word " Stillman " prominently on their labels, and also claim that the general effect of the defendants' labels, design, colors, &c., is to deceive and to induce purchasers to believe that they are buying the goods manufactured by the plaintiffs.

Trade-marks were classified by Lord Romilly, M. R., into personal and local. Mr. Tudor (Leading Cases, 2d ed. vol. ii.

*573) suggests, as additional classes : *third*, symbolical, as figures of animals, &c. ; *fourth*, where a fancy name is used ; and *fifth*, where the claim is to a trade-mark compounded more or less of the others.   In the old actions at law the remedy was chiefly on the ground of fraud.   See a review of them in *Motley* v. *Downman*, 3 M. & C. 1.   See also *Crawshay* v. *Thompson et als.* 4 M. & G. 357 ; also American note to last case 43 Eng. Com. Law Rep. 204 ; *Southern* v. *How*, Popham, 143 ; 3 Cro. Jac. 468.   But as that remedy is now seldom resorted to, we need only inquire into the grounds on which courts of equity exercise jurisdiction.   In some of the early cases, it was rested on the ground of fraud.   In some later cases, partly on that ground and partly on the ground that it was to be treated as a species of property.   In the case of *The Collins Co.* v. *Brown*, 3 Kay & J. 423, which was a case of edge tools, Page-Wood, V. C., says (page 426) : " It is now settled law, that there is no property whatever in a trade-mark ; but that a person may acquire a right of using a particular mark for articles which he has manufactured, so that he may be able to prevent any other person from using it, because the mark denotes that articles so marked were manufactured by a certain person."   And (page 431), " No person can acquire property in a trade-mark."   But no one has a right to use it to deceive.

Subsequently, in the case of *Hall* v. *Barrows*, Lord Romilly, M. R. (A. D. 1863, 11 W. R. 525), held that it rested on the ground of property ; and Lord Westbury, L. C., in the same case (12 W. R. 322 ; 4 De G., J. & S. 150), put it on the same ground, arguing that fraud on the public was no reason for relief unless it caused damage to the plaintiff, and that the defendants were liable to be enjoined in many cases where no fraud was intended.   This was a case of a very old partnership which had been changed several times, so that the trade-mark, consisting of the initial letters of the names of the original partners, did not represent the names of the present firm, and the dispute was between persons claiming under the firm ; when examined, we find it merely decides that a trade-mark, consisting of a name, may be sold with the works in such a manner as to prevent a surviving partner from using it, and the court expressly say that they do not mean to decide that it could be sold separately from the works.

The recent case of *The Singer Manufacturing Co.* v. *Wilson*, decided in August, 1876, by the Lords of the Court of Appeal in England (24 W. R. 1023), contains a full discussion of this question, and qualifies very materially the doctrine of property in a name or mark.

The plaintiffs in that case claimed that, while they had patents for parts of their machinery, they never had a patent particularly descriptive of any one machine; that the name did not imply any specific principle of construction, but merely designated the machines made by the plaintiffs; and that they had acquired a great reputation by reason of their excellence and durability; that the defendants, under that name, manufactured and sold inferior machines, to the injury of the reputation of the plaintiffs.

The defendants denied that the term "Singer," as understood by the trade, designated any particular manufacture, but claimed that it represented only one of two modes of construction. It appeared that the defendants' names were on all their machines, that there was no similarity in their marks, but that the defendants advertised machines as manufactured by themselves, of sorts formerly patented in America, and with improvements of their own, and described them as of several sorts, using the name of the plaintiffs for one.

The case, although it was only an advertisement, and the name was not on the machines sold, involved, as will be seen from the arguments, the right to the use of the name, and the whole subject of trade-marks was discussed.

Jessel, M. R., refused to grant an injunction. He remarks upon the various classes of cases of trade-marks and trade names, and says, "There is no right in a trade-mark except to protect the manufacturer of the goods;" that the defendant tells the purchaser fully and openly, and not in small type, that the goods were made by himself; and concludes that the defendant had a right to use the name when he did it for no other purpose than to show the kind of machine.

On appeal to the Lords Justices (24 W. R. 1023), they confirmed the decision. James, L. J., approving of the law as laid down by the Master of the Rolls, goes on to say that, in both classes of cases, the fraud is the ground of relief, and that the

trade-mark proper only differs in this respect, that it may be used for purposes of deception, not only between the first vendor and vendee, but between subsequent vendors and vendees, and, therefore, there is so far what is called a property in it that the court will interfere even when there is no fraud between the original parties. Mellish, L. J., after going into a history of the decisions, observes that there is a property in a trade-mark, and also in a trade name, but that there is not a single English case where relief has been granted unless there had been some false representations; and commenting on a Scotch decision in relation to the same trade name (11 Court of Sessions Cases, 3d series, 267), goes on to say that that decision departs altogether from the principle that the right to a trade-mark is founded on deception; that the English courts have not gone, and ought not to go, to the length of holding that they would prevent any one from using a trade-mark or trade name, whether calculated to deceive or not; and remarks on the efforts made to secure a monopoly by use of these marks and names, as if they had a patent.

And he concludes that "no action or suit of this nature can be maintained for the improper use of a trade-mark, or for the improper use of a trade name, unless it is founded on misrepresentation," and that there was no evidence of such in that case.

Duer, J., in *Fetridge* v. *Wells*, 4 Ab. Pr. 144, on page 146, says: "It is not necessary to deny that a name may in some cases be rightfully used and protected as a trade-mark, but this is only true when the name is used merely as indicating the true origin or ownership of the article offered for sale; never where it is used to designate the article itself, and has become, by adoption and use, its proper appellation." See also *Fetridge* v. *Wells*, 13 How. Pr. 385. In *Ferguson* v. *Davol Mills*, 2 Brews. 314, Alison, J., says, on page 318: "A person has no right to a sign or symbol which, from the nature of the fact it is used to signify, others may employ with equal truth, and therefore have an equal right to use for the same purpose." And on page 320: "Protection is given only in consideration of the guaranty of the integrity of the manufacturer or merchant, certified by his trademark. When the device fails to accomplish this end it is no trade-mark, and all claims founded thereon must be rejected."

And that it is only on the ground of false representations that a complainant is entitled to protection, see remarks of Page-Wood, V. C., in *Collins Co.* v. *Brown*, 3 Kay & J. 423. And to the same effect see *Williams* v. *Johnson*, 2 Bosw. 1 ; *Coffeen* v. *Brunton*, 4 McLean, 516 ; *Amoskeag Manuf. Co.* v. *Spear*, 2 Sandf. 599, where relief was granted on the ground of misrepresentation, and only to that extent; *Ferguson* v. *Davol Mills*, 2 Brews. 314 ; *Perry* v. *Truefit*, 6 Beav. 66. See also Story Eq. Juris. § 951 *b ;* Snell's Principles of Equity (3d ed.), 501.

Says Duer, J., in *Fetridge* v. *Wells*, 4 Ab. Pr. 146, speaking of the claim of property in the name, " This, however, is a species of property that, in my opinion, is unknown to the law." Some of the cases which seem to hold otherwise were, where property was claimed, not merely in the name, but in the composition to which it was applied, &c., &c.

In *Knott* v. *Morgan*, 2 Keen, 213 (A. D. 1836), which was a motion to restrain defendants from using the name of an omnibus, Lord Langdale, M. R., said the plaintiffs had no exclusive right to the use of the words, or any other words ; but they had a right to restrain defendants from using the words and devices they had adopted to distinguish their property, and so injuring their business. The injunction was granted, and, on appeal, sustained by Lord Cottenham.

These remarks on the nature of the right have a bearing on the question of its assignability.

Upon this question there has been a great variety of decisions, and it is difficult to reconcile them.

A proper classification of the cases would probably remove some of the difficulty.

Where, from its being a peculiar invention, or secret process, or particular mode of manufacture, not generally known to the public, the knowledge of these processes might be communicated to others and the public, and the purchasers should be protected against imitations. These circumstances would give a value to the process, and assimilate it to the nature of property which might be disposed of.

In some of the cases the question has been between partners, or there has been a sale of a business, to be continued by the vendee, and more or less connected with a place and the good-

will of the business; and in many of these cases the sale of the trade-mark would be upheld. See *Dixon Crucible Co.* v. *Guggenheim*, 2 Brews. 321. So where the name denotes the product of a particular property, *e. g.* " Congress Spring," or wine made from a particular vineyard. In such cases there is no property in the words, but only as the means of designating a property. *Congress & Empire Spring Co.* v. *High Rock Congress Spring Co.* 57 Barb. S. C. 526.

But where the reputation of the goods and of the name has grown out of excellence of manufacture, depending on the honesty and skill of the maker, it is more difficult to hold that it can be sold to a stranger, or that it is generally assignable.

In *The Leather Cloth Co.* v. *Amer. Leather Cloth Co.* 11 W. R. 931; 1 H. & M. 271; 4 De G., J. & S. 137; 11 H. L. 523, an English company had purchased the business of an American company, and applied for an injunction against persons using certain marks, representing their goods as being the article known as " Crockett's leather cloth," &c., &c. Wood, V. C., had granted an injunction, and, on appeal, Westbury, L. C., reversed his decision, 4 De G., J. & S. 137; and this reversal was confirmed by the House of Lords. 11 H. L. 523 (A. D. 1865). Many remarks of the Lord Chancellor and of the Lords are directly applicable to the case before us. Says the Lord Chancellor, 4 De G., J. & S. 143: " But suppose an individual or a firm to have gained credit for a particular manufacture, and that the goods are marked or stamped in such a way as to denote that they are made by such person or firm, and that the name has gained currency and credit in the market, there being no secret process nor invention, could such person or firm, on ceasing to carry on business, sell and assign the right to use such name and mark to another firm carrying on the same business in a different place? Suppose a firm of A., B. & Co. to have been clothiers, in Wiltshire, for fifty years, and that broadcloth marked " A., B. & Co., makers, Wilts.," has obtained a great reputation in the market, and that A., B. & Co., on discontinuing business, sell and transfer the right to use their name and mark to a firm of C., D. & Co., who are clothiers, in Yorkshire; would the latter be protected by a court of equity in their claim to an exclusive right to use the name and mark of A., B. & Co.? I am of opin-

ion that no such protection ought to be given. It is true, that a name, or the style of a firm, may, by long usage, become a mere trade-mark, and cease to convey any representation as to the fact of the person who makes, or the place of manufacture ; but where any symbol or label, claimed as a trade-mark, is so constructed or worded as to make or contain a distinct assertion which is false, I think no property can be claimed in it ; or, in other words, the right to the exclusive use of it cannot be maintained."

" To sell an article stamped with a false statement is *pro tanto* an imposition on the public, and, therefore, in the case supposed, the plaintiff and defendant would be both *in pari delicto.* This is consistent with many decided cases."

And on page 145, the complainant " desires to restrain the defendant from selling his own goods as the goods of another person ; but if, by the use of the trade-mark in question, the plaintiff himself is representing and selling his goods as the goods of another, or if his trade-mark gives a false description of the article, he is violating the rule on which he seeks relief against the defendant."

Says Lord Cranworth, 11 H. L. 534 : " But I further think that the right to a trade-mark may, in general, treating it as property, or as an accessory of property, be sold and transferred upon a sale and transfer of the manufactory of the goods on which the mark has been used to be affixed, and may be lawfully used by the purchaser. Difficulties, however, may arise where the trade-mark consists merely of the name of the manufacturer. When he' dies, those who succeed him, grandchildren or married daughters, for instance, though they may not bear the same name, yet ordinarily continue to use the original name as a trade-mark, and they would be protected against any infringement of the exclusive right to that mark. They would be so protected, because, according to the usages of trade, they would be understood as meaning no more by the use of their grandfather's or father's name, than that they were carrying on the manufacture formerly carried on by him. Nor would the case be necessarily different if, instead of passing into other hands by devolution of law, the manufactory were sold and assigned to a purchaser. The question in every such case must be, whether the pur-

chaser, in continuing the use of the original trade-mark, would, according to the ordinary usages of trade, be understood as saying more than that he was carrying on the same business as had been formerly carried on by the person whose name constituted the trade-mark. In such a case I see nothing to make it improper for the purchaser to use the old trade-mark, as the mark would, in such a case, indicate only that the goods so marked were made at the manufactory which he had purchased."

Lord Kingsdown, 11 H. L. 544, says : " Though a man may assign his business, and the use of his firm, and of his trade-mark as belonging to it, that proceeds, in my opinion, upon the ground which I have stated, that the use of the name of the firm is not understood in trade to signify that certain individuals and no others are engaged in the concern. Though a man may have a property in a trade-mark, in the sense of having a right to exclude any other trader from the use of it in selling the same description of goods, it does not follow that he can, in all cases, give another person a right to use it or to use his name. If an artist or an artisan has acquired by his personal skill and ability a reputation which gives to his works in the market a higher value than those of other artists or artisans, he cannot give to other persons the right to affix his name or mark to their goods, because he cannot give to them the right to practise a fraud upon the public."

Westbury, L. C., 11 H. L. 546, says, in concluding the case : " What is here called by the appellants a trade-mark is, in reality, an advertisement of the character and quality of their goods."

In *Bury* v. *Bedford*, 4 De G., J. & S. 352, a corporate trademark had been assigned. The question arose under the special acts governing the company, and also under the general law. Turner, L. J., in giving judgment, says, page 369 : " But without going the length of saying that a mark may not, in some cases, be so completely personal as of necessity to import that the goods sold under it have been manufactured by a particular individual, and that the assignability of such a mark may not be open to objection on that ground, although the objection would, as it seems to me, apply rather to the use of the mark when as-

signed than to the power of assigning it: I think that all cases
of this description must depend upon their particular circum-
stances. Much must, I think, depend upon the nature of the
mark, and the mode in which it has been used. It is evident
that a mark, although it may in some respects indicate the per-
son by whom the goods have been manufactured, may refer
much more closely to the place of manufacture than to the per-
son of the manufacturer; and it is not less evident that a mark,
although personal in its inception, may, from the mode in which
it has been used, have become appropriated to goods manufact-
ured at particular works."

In *Samuel* v. *Berger*, 24 Barb. S. C. 164; 4 Ab. Pr. 88, the
plaintiffs had purchased from Brindle the right to use his name
on watches made by them. The defendant was selling watches
actually made by Brindle. The court says, 4 Ab. Pr. 89: " The
plaintiffs ask the court to aid them in passing off upon the pub-
lic watches manufactured by them, and held out to the public
as made by Brindle, when, in truth, the watches made by Brin-
dle, and stamped by him with his mark, are those which the de-
fendants seek to sell." The injunction prayed for was refused.

In *Meriden Britannia Co.* v. *Parker*, 39 Conn. 450, three
brothers, Rogers, had made plated spoons, &c., with their name,
and, on giving up business, had agreed that the plaintiffs might
use their names in manufacturing them, the manufacture to be
carried on under their supervision. Three other persons of the
name of Rogers, who had been making coffin trimmings, arranged
with the defendants to make the same goods with their name,
" Rogers," on them. The defendants objected that the marks
used by the plaintiffs did not indicate the true origin of the
goods. The court, while admitting the principle that they would
not protect any mark which tended to deceive the public, held,
that the agreement on which the plaintiffs relied was good, on
the ground of the supervision above referred to.

In the case of *Partridge* v. *Menck*, 2 Sandf. Ch. 622; 2 Barb.
Ch. 101, Golsh had acquired a reputation for making matches,
and the complainant succeeded to his business, and continued to
use his name. The Vice-Chancellor, 2 Sandf. Ch. 622, and the
Chancellor, 2 Barb. Ch. 101, had refused an injunction, on the
ground that the defendant's labels were sufficiently dissimilar

from the plaintiff's, and that on them the defendant represented himself as " late chemist to A. Golsh." When it came before the Court of Appeals, How. App. Cas. 547; Cox, Trade-mark Cas. 79, the result was the same; but it was put, and by one of the judges chiefly, on the ground of the misrepresentation in the plaintiff's label. " The statement of the label was false. The matches were not Golsh's matches, in the sense in which it was intended that purchasers should understand these terms," page 558. . . . . " Verbal declarations to a purchaser, of the same kind, with a view to a sale of this article, it was conceded, would have been fraudulent," page 559. " The privilege of deceiving the public, even for their own benefit, is not a legitimate subject of commerce," pages 599, 561, note.

The case of *Palmer* v. *Harris*, 60 Pa. St. 156, was not a case of sale of the mark; but, in that case, the Supreme Court of Pennsylvania refused an injunction, on the ground that the complainant's labels did not state the facts truly. And see remarks in Brown on Trade-marks, § 361.

In *Motley* v. *Downman*, 3 Myl. & C. 1 (A. D. 1837), the Morgans had for many years manufactured tin plates at Carmarthen, and used " M. C.," meaning Morgan, Carmarthen, as a trademark, and dissolved about 1820. One of the plaintiffs, a partner in the old firm, formed a new firm, bought the stock and good-will, took a lease of the works to expire in 1827, and manufactured the plates with the same mark. About 1825 they removed their business to Margam, about forty-four miles from Carmarthen, and, with several changes as to partners, continued there the business and the use of the mark. From 1825 to 1836 the old works were closed. In 1836 the defendants hired the old works, began business as the " M. C. Tin Plate Co.," and manufactured the tin plates with the " M. C." mark, with the word " Carmarthen " in large characters, under the letters " M. C." A bill was brought for injunction; Shadwell, V. C., granted one, and, on appeal, Cottenham, L. C., dissolved it. He said the real question was, whether the former occupants of the works had acquired a right to prevent subsequent tenants from using a mark which it was clear was originally derived from those works. The injunction was dissolved, with liberty to sue at law.

There is to be noticed a peculiarity in some English cases,

growing out of the practice of keeping up the name of an old mercantile firm for several generations, or successions of partners, and when no partner of the original name remained. This practice is noticed and commented on in *Hall* v. *Barrows*, 4 De G., J. & S. 150, 156 ; *The Leather Cloth Co.* v. *The American Leather Cloth Co.* Ibid. 137, 143 ; and by Lord Kingsdown, in the last named case in House of Lords, 11 H. L. 542, mentioning instances. See also *Croft* v. *Day*, 7 Beav. 84. In such cases no one is deceived. The name and good-will are understood by the public to belong to the existing firm.

It is believed, so far as we can learn from the cases, that that practice is not common in this country, and in New York it is forbidden by express statute. So also in France.

Parsons on Contracts, 6th ed. 1873, vol. 2, book III. cap. 15, § 4, C. *257 br., states the rule, that, where a trade-mark " declares that an article is made by a particular person or firm, it cannot be transferred ; " and this seems to be sustained by the cases.

In the present case there has been no continuation of an old firm by a gradual change of its members. There is no person of the name of Stillman in the complainants' firm, and the goods (although one of the partners was superintendent of the old firm) are made by a new firm, and in another place. The goods had (and it may be as claimed, through the skill of Carmichel) acquired a valuable reputation ; but that old firm does not now exist. They do not describe themselves as successors, or the goods as made by one who was formerly superintendent, but by the old firm as if it still existed.

It has not been claimed by the respondents that the complainants intend any deception. The facts are probably pretty well understood by the large dealers, and by the trade generally.

And if we look upon the mark as having come to designate merely a quality or sort of goods, in that light the complainants would not be entitled to the exclusive use of it.

On the other hand, the defendants hire the old mill, formerly occupied by Stillman & Co., and are making linseys there. While there is evidence that this mill was often called the " Seventh Day Mill," there is reliable evidence that it was also called the " Stillman Mill." It was leased to the defendants by that name,

two years before they began the manufacture complained of. Persons of that name have been engaged in Westerly in manufacturing for many years, and there is evidence that the name of Stillman has also been applied to other mills. The defendants have a right to call their mills so if they choose.

The labels, it is true, are of about the same size, but the borders are dissimilar, and the defendants' ticket gives the true names of the makers, not in small type, but in letters of sufficient size not to be overlooked. The similarity is only in the one prominent word, "Stillman." We cannot deny them the right to use the name of their mills on their tickets, being satisfied that the name was not a new name, given to the mills for purposes of deception, but that their mill might properly be, and had been, so called; and that the name, "Stillman," was used with sufficient explanation (to use the language of some cases) to prevent any misunderstanding.

Evidence has been put in showing the excellent quality of the goods made by the plaintiffs, and, so far as the evidence goes, some of the goods of the defendants have been of a less substantial make, and were sold for a less price, the purchasers knowing the difference.

The fact that Stillman, Stanton & Co. paid George Stillman for the use of the old name, we cannot consider as of much weight, as that firm contained several of the persons who were in the old firm who had sold to George the right to use it.

We must, therefore, deny the motion for an injunction.

DURFEE, C. J., concurring. There are cases in which a court of chancery refuses to protect a trade-mark because it is an imposition on the public. The defendants contend that this is a case of that kind. I think, however, there is little reason to doubt that purchasers who are looking for Stillman & Co.'s linseys get what they are looking for when they get the linseys manufactured by the plaintiffs. The firm of Stillman & Co. has ceased to exist, and, consequently, Stillman & Co.'s linseys, manufactured by Stillman & Co., can no longer be procured; but the plaintiffs are their successors, by purchase, in the use of their firm name, and continue the same manufacture with improvement, and, therefore, I am reluctant to hold, that a continuance of the old name upon their labels is intrinsically any fraud upon

the public, who are interested to get the same or a better man-
ufacture, but who, so long as they do get it, can have little care
whether it comes from the original manufacturers or their suc-
cessors.  And see *Eddleston* v. *Vick*, 18 Jur. 7; Cox Amer.
Trade-mark Cas. 666 ; *Fulton* v. *Sellers & Co.* 4 Brews. 42;
*Dale* v. *Smithson*, 12 Ab. Pr. 237 ; Cox Amer. Trade-mark Cas.
282; *Dixon Crucible Co.* v. *Guggenheim*, 2 Brews. 321 ; Cox
Amer. Trade-mark Cas. 559.

There is a defence, which, to my mind, seems more merito-
rious.  If the firm of Stillman & Co. was still in existence, and
was the plaintiff in this suit, I should find it difficult to protect
it by an injunction.  The trouble is, the label of the defend-
ants does not resemble the label of the plaintiffs closely enough
to deceive any person of ordinary discernment, unless the name
" Stillman," which is prominent in both labels, may mislead him.
The plaintiffs, therefore, can have no relief unless they can show
that the defendants have no right to use that name as they do
use it in their labels.  How can the plaintiffs do this when the
surname of one of the defendants is Stillman, and when the mill
where the linseys are manufactured, though it may be popularly
known as the " Seventh Day Mill," is also properly called the
" Stillman Mill ? "  A manufacturer has a right to attach his
own name to his manufactures, even though a rival manufacturer
of the same name, who has given it prestige in the market, may
suffer in consequence.  The resulting damage is *damnum absque
injuria*.  This doctrine was recognized in *Croft* v. *Day*, 7 Beav.
84 ; *Holloway* v. *Holloway*, 13 Beav. 209 ; *Burgess* v. *Burgess*,
17 Jur. 292, where, however, injunctions were granted because
the names were coupled with simulative *indicia ;* and in *Faber*
v. *Faber*, 49 Barb. S. C. 357.  See also *Clark* v. *Clark*, 25
Barb. S. C. 76 ; *Rogers* v. *Taintor*, 97 Mass. 291, where it was
strongly asserted.

And if a manufacturer has the right to label the products of
his mill with his name, I do not see why he has not an equal
right to label them with the name of that mill itself, provided the
name is not unfairly assumed for that purpose, or fraudulently
employed.  *Newman et al.* v. *Alvord & Bailey*, 49 Barb. S. C.
588; *Glendon Iron Co.* v. *Uhler & Fulmer*, 75 Pa. St. 467 ; *Brook-
lyn White Lead Co.* v. *Masury*, 25 Barb. S. C. 416 ; *Condee* v.

*Deere*, 10 Amer. Law. Reg. N. S. 694; *Canal Co.* v. *Clark*, 13 Wall. 311. In the last named case the Supreme Court of the United States said, " Equity will not enjoin against telling the truth."

The plaintiffs have submitted testimony to show that the defendants, in calling their mill the " Stillman Mill," are not telling the truth. I am not satisfied of this. The defendants, perhaps, are not unwilling to profit by the reputation which the plaintiffs have acquired for the name; but I do not find that they are practising any such fraud to that end as entitles the plaintiffs to an injunction. The testimony shows that the mill has been popularly known as " The Seventh Day Mill," but it appears that that name is a kind of nickname, given to it because its owners have been Sabbatarians. Naturally the defendants would not care to put their goods upon the market under such a name. The defendants also show, by their testimony, that the mill has long been known to certain persons as the " Stillman Mill," and that a portion of its products, before even it came into the hands of the defendants, was sold with labels or tickets attached bearing that name. Moreover, I do not find any proof of a fraudulent imitation of the plaintiffs' label. The words, " Stillman Mill," are not on that label. The resemblances are general, and may have occurred without improper design; and that they did so occur is inferrible from the testimony of the engraver, who says he knew nothing of the plaintiffs' label. Indeed, if the plaintiffs have suffered from the competition of the defendants, I am inclined to think they have suffered rather because the linseys made by the defendants are considerably cheaper than those made by the plaintiffs, while closely resembling them, than because of any similarity in their respective labels. Against the losses incident to such a competition the court, of course, cannot protect. I therefore concur in the decision against granting the injunction.          *Injunction refused.*

*Peabody & Crafts*, for complainants.

*N. F. Dixon, & N. F. Dixon, Jr.*, for respondents.

NOTE BY THE REPORTER. — After the foregoing opinion, the case was settled by the following agreement: —

" Agreement entered into between Latimer, Stillman & Co., of the first part, and A. Carmichel & Co., of the second part.

" The parties of the first part agree that they will discontinue the use of the words, ' Stillman Mills,' on their Linsey Tickets.

" That the words, ' Latimer, Stillman & Co.,' will be used by them on their said tickets.

" But they agree not to use the same style of letters now used by A. Carmichel & Co. on their ' Stillman & Co.' Linsey Tickets, and not to use them in the same form.

" The parties of the second part agree to withdraw the suit now pending in the Supreme Court, in the State of Rhode Island, against the parties of the first part.

" Witnesses :                         LATIMER, STILLMAN & CO.
   W. A. SEGAR.                A. CARMICHEL & CO.
   IRA G. BRIGGS.
" WESTERLY, R. I., *February* 14, 1877."